# MATHEWS, SECRETARY OF HEALTH, EDUCATION, AND WELFARE *v.* ELDRIDGE

No. 74-204. Argued October 6, 1975—Decided February 24, 1976

320

322

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, and REHNQUIST, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 349. STEVENS, J., took no part in the consideration or decision of the case.

*Solicitor General Bork* argued the cause for petitioner. With him on the briefs were *Deputy Solicitor General Jones, Acting Assistant Attorney General Jaffe, Gerald P. Norton, William Kanter*, and *David M. Cohen.*

*Donald E. Earls* argued the cause for respondent. With him on the briefs was *Carl E. McAfee.** 

MR. JUSTICE POWELL delivered the opinion of the Court.

The issue in this case is whether the Due Process Clause of the Fifth Amendment requires that prior to the termination of Social Security disability benefit payments the recipient be afforded an opportunity for an evidentiary hearing.

I

Cash benefits are provided to workers during periods in which they are completely disabled under the disability insurance benefits program created by the 1956 amendments to Title II of the Social Security Act. 70 Stat. 815, 42 U. S. C. § 423.[1] Respondent Eldridge was first awarded benefits in June 1968. In March 1972, he received a questionnaire from the state agency charged with monitoring his medical condition. Eldridge com-

---

*\*J. Albert Woll, Laurence Gold,* and *Stephen P. Berzon* filed a brief for the American Federation of Labor and Congress of Industrial Organizations et al. as *amici curiae* urging affirmance.

*David A. Webster* filed a brief for Caroline Williams as *amicus curiae.*

[1] The program is financed by revenues derived from employee and employer payroll taxes. 26 U. S. C. §§ 3101 (a), 3111 (a); 42 U. S. C. § 401 (b). It provides monthly benefits to disabled persons who have worked sufficiently long to have an ·insured status, and who have had substantial work experience in a specified interval directly preceding the onset of disability. 42 U. S. C. §§ 423 (c)(1)(A) and (B). Benefits also are provided to the worker's dependents under specified circumstances. §§ 402 (b)–(d). When the recipient reaches age 65 his disability benefits are automatically converted to retirement benefits. §§ 416 (i)(2)(D), 423 (a)(1). In fiscal 1974 approximately 3,700,000 persons received assistance under the program. Social Security Administration, The Year in Review 21 (1974).

pleted the questionnaire, indicating that his condition had not improved and identifying the medical sources, including physicians, from whom he had received treatment recently. The state agency then obtained reports from his physician and a psychiatric consultant. After considering these reports and other information in his file the agency informed Eldridge by letter that it had made a tentative determination that his disability had ceased in May 1972. The letter included a statement of reasons for the proposed termination of benefits, and advised Eldridge that he might request reasonable time in which to obtain and submit additional information pertaining to his condition.

In his written response, Eldridge disputed one characterization of his medical condition and indicated that the agency already had enough evidence to establish his disability.[2] The state agency then made its final determination that he had ceased to be disabled in May 1972. This determination was accepted by the Social Security Administration (SSA), which notified Eldridge in July that his benefits would terminate after that month. The notification also advised him of his right to seek reconsideration by the state agency of this initial determination within six months.

Instead of requesting reconsideration Eldridge commenced this action challenging the constitutional valid-

---

[2] Eldridge originally was disabled due to chronic anxiety and back strain. He subsequently was found to have diabetes. The tentative determination letter indicated that aid would be terminated because available medical evidence indicated that his diabetes was under control, that there existed no limitations on his back movements which would impose severe functional restrictions, and that he no longer suffered emotional problems that would preclude him from all work for which he was qualified. App. 12–13. In his reply letter he claimed to have arthritis of the spine rather than a strained back.

ity of the administrative procedures established by the Secretary of Health, Education, and Welfare for assessing whether there exists a continuing disability. He sought an immediate reinstatement of benefits pending a hearing on the issue of his disability.[3] 361 F. Supp. 520 (WD Va. 1973). The Secretary moved to dismiss on the grounds that Eldridge's benefits had been terminated in accordance with valid administrative regulations and procedures and that he had failed to exhaust available remedies. In support of his contention that due process requires a pretermination hearing, Eldridge relied exclusively upon this Court's decision in *Goldberg* v. *Kelly,* 397 U. S. 254 (1970), which established a right to an "evidentiary hearing" prior to termination of welfare benefits.[4] The Secretary contended that *Goldberg* was not controlling since eligibility for disability benefits, unlike eligibility for welfare benefits, is not based on financial need and since issues of credibility and veracity do not play a significant role in the disability entitlement decision, which turns primarily on medical evidence.

The District Court concluded that the administrative procedures pursuant to which the Secretary had terminated Eldridge's benefits abridged his right to procedural

---

[3] The District Court ordered reinstatement of Eldridge's benefits pending its final disposition on the merits.

[4] In *Goldberg* the Court held that the pretermination hearing must include the following elements: (1) "timely and adequate notice detailing the reasons for a proposed termination"; (2) "an effective opportunity [for the recipient] to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally"; (3) retained counsel, if desired; (4) an "impartial" decisionmaker; (5) a decision resting "solely on the legal rules and evidence adduced at the hearing"; (6) a statement of reasons for the decision and the evidence relied on. 397 U. S., at 266–271. In this opinion the term "evidentiary hearing" refers to a hearing generally of the type required in *Goldberg.*

due process. The court viewed the interest of the disability recipient in uninterrupted benefits as indistinguishable from that of the welfare recipient in *Goldberg*. It further noted that decisions subsequent to *Goldberg* demonstrated that the due process requirement of pretermination hearings is not limited to situations involving the deprivation of vital necessities. See *Fuentes* v. *Shevin*, 407 U. S. 67, 88–89 (1972); *Bell* v. *Burson*, 402 U. S. 535, 539 (1971). Reasoning that disability determinations may involve subjective judgments based on conflicting medical and nonmedical evidence, the District Court held that prior to termination of benefits Eldridge had to be afforded an evidentiary hearing of the type required for welfare beneficiaries under Title IV of the Social Security Act. 361 F. Supp., at 528.[5] Relying entirely upon the District Court's opinion, the Court of Appeals for the Fourth Circuit affirmed the injunction barring termination of Eldridge's benefits prior to an evidentiary hearing. 493 F. 2d 1230 (1974).[6] We reverse.

## II

At the outset we are confronted by a question as to whether the District Court had jurisdiction over this suit. The Secretary contends that our decision last Term in *Weinberger* v. *Salfi*, 422 U. S. 749 (1975), bars the District Court from considering Eldridge's action. *Salfi* was an action challenging the Social Security Act's

---

[5] The HEW regulations direct that each state plan under the federal categorical assistance programs must provide for pretermination hearings containing specified procedural safeguards, which include all of the *Goldberg* requirements. See 45 CFR § 205.10 (a) (1975); n. 4, *supra*.

[6] The Court of Appeals for the Fifth Circuit, simply noting that the issue had been correctly decided by the District Court in this case, reached the same conclusion in *Williams* v. *Weinberger*, 494 F. 2d 1191 (1974), cert. pending, No. 74–205.

duration-of-relationship eligibility requirements for surviving wives and stepchildren of deceased wage earners. We there held that 42 U. S. C. § 405 (h)[7] precludes federal-question jurisdiction in an action challenging denial of claimed benefits. The only avenue for judicial review is 42 U. S. C. § 405 (g), which requires exhaustion of the administrative remedies provided under the Act as a jurisdictional prerequisite.

Section 405 (g) in part provides:

> "Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow." [8]

---

[7] Title 42 U. S. C. § 405 (h) provides in full:

"(h) Finality of Secretary's decision.

"The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 41 of Title 28 to recover on any claim arising under this subchapter."

[8] Section 405 (g) further provides:

"Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States District Court for the District of Columbia. . . . The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . ."

328

On its face § 405 (g) thus bars judicial review of any denial of a claim of disability benefits until after a "final decision" by the Secretary after a "hearing." It is uncontested that Eldridge could have obtained full administrative review of the termination of his benefits, yet failed even to seek reconsideration of the initial determination. Since the Secretary has not "waived" the finality requirement as he had in *Salfi, supra,* at 767, he concludes that Eldridge cannot properly invoke § 405 (g) as a basis for jurisdiction. We disagree.

*Salfi* identified several conditions which must be satisfied in order to obtain judicial review under § 405 (g). Of these, the requirement that there be a final decision by the Secretary after a hearing was regarded as "central to the requisite grant of subject-matter jurisdiction . . . ." 422 U. S., at 764.[9] Implicit in *Salfi,* however, is the principle that this condition consists of two elements, only one of which is purely "jurisdictional" in the sense that it cannot be "waived" by the Secretary in a particular case. The waivable element is the requirement that the administrative remedies prescribed by the Secretary be exhausted. The nonwaivable element is the requirement that a claim for benefits shall have been presented to the Secretary. Absent such a claim there can be no "decision" of any type. And some decision by the Secretary is clearly required by the statute.

---

[9] The other two conditions are (1) that the civil action be commenced within 60 days after the mailing of notice of such decision, or within such additional time as the Secretary may permit, and (2) that the action be filed in an appropriate district court. These two requirements specify a statute of limitations and appropriate venue, and are waivable by the parties. *Salfi,* 422 U. S., at 763–764. As in *Salfi* no question as to whether Eldridge satisfied these requirements was timely raised below, see Fed. Rules Civ. Proc. 8 (c), 12 (h)(1), and they need not be considered here.

That this second requirement is an essential and distinct precondition for § 405 (g) jurisdiction is evident from the different conclusions that we reached in *Salfi* with respect to the named appellees and the unnamed members of the class. As to the latter the complaint was found to be jurisdictionally deficient since it "contain[ed] no allegations that they have even filed an application with the Secretary . . . ." 422 U. S., at 764. With respect to the named appellees, however, we concluded that the complaint was sufficient since it alleged that they had "fully presented their claims for benefits 'to their district Social Security Office and, upon denial, to the Regional Office for reconsideration.' " *Id.*, at 764–765. Eldridge has fulfilled this crucial prerequisite. Through his answers to the state agency questionnaire, and his letter in response to the tentative determination that his disability had ceased, he specifically presented the claim that his benefits should not be terminated because he was still disabled. This claim was denied by the state agency and its decision was accepted by the SSA.

The fact that Eldridge failed to raise with the Secretary his constitutional claim to a pretermination hearing is not controlling.[10] As construed in *Salfi*, § 405 (g) requires only that there be a "final decision" by the Secretary with respect to the claim of entitlement to benefits. Indeed, the named appellees in *Salfi* did not present their constitutional claim to the Secretary. *Weinberger* v. *Salfi*, O. T. 1974, No. 74–214, App. 11, 17–21. The situation here is not identical to *Salfi*, for, while the

---

[10] If Eldridge had exhausted the full set of available administrative review procedures, failure to have raised his constitutional claim would not bar him from asserting it later in a district court. Cf. *Flemming* v. *Nestor*, 363 U. S. 603, 607 (1960).

Secretary had no power to amend the statute alleged to be unconstitutional in that case, he does have authority to determine the timing and content of the procedures challenged here. 42 U. S. C. § 405 (a). We do not, however, regard this difference as significant. It is unrealistic to expect that the Secretary would consider substantial changes in the current administrative review system at the behest of a single aid recipient raising a constitutional challenge in an adjudicatory context. The Secretary would not be required even to consider such a challenge.

As the nonwaivable jurisdictional element was satisfied, we next consider the waivable element. The question is whether the denial of Eldridge's claim to continued benefits was a sufficiently "final" decision with respect to his constitutional claim to satisfy the statutory exhaustion requirement. Eldridge concedes that he did not exhaust the full set of internal-review procedures provided by the Secretary. See 20 CFR §§ 404.910, 404.916, 404.940 (1975). As *Salfi* recognized, the Secretary may waive the exhaustion requirement if he satisfies himself, at any stage of the administrative process, that no further review is warranted either because the internal needs of the agency are fulfilled or because the relief that is sought is beyond his power to confer. *Salfi* suggested that under §405 (g) the power to determine when finality has occurred ordinarily rests with the Secretary since ultimate responsibility for the integrity of the administrative program is his. But cases may arise where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate. This is such a case.

Eldridge's constitutional challenge is entirely collateral to his substantive claim of entitlement. Moreover, there

is a crucial distinction between the nature of the constitutional claim asserted here and that raised in *Salfi*. A claim to a predeprivation hearing as a matter of constitutional right rests on the proposition that full relief cannot be obtained at a postdeprivation hearing. See *Regional Rail Reorganization Act Cases,* 419 U. S. 102, 156 (1974). In light of the Court's prior decisions, see, *e. g., Goldberg* v. *Kelly,* 397 U. S. 254 (1970); *Fuentes* v. *Shevin,* 407 U. S. 67 (1972), Eldridge has raised at least a colorable claim that because of his physical condition and dependency upon the disability benefits, an erroneous termination would damage him in a way not recompensable through retroactive payments.[11] Thus, unlike the situation in *Salfi,* denying Eldridge's substantive

---

[11] Decisions in different contexts have emphasized that the nature of the claim being asserted and the consequences of deferment of judicial review are important factors in determining whether a statutory requirement of finality has been satisfied. The role these factors may play is illustrated by the intensely "practical" approach which the Court has adopted, *Cohen* v. *Beneficial Ind. Loan Corp.,* 337 U. S. 541, 546 (1949), when applying the finality requirements of 28 U. S. C. § 1291, which grants jurisdiction to courts of appeals to review all "final decisions" of the district courts, and 28 U. S. C. § 1257, which empowers this Court to review only "final judgments" of state courts. See, *e. g., Harris* v. *Washington,* 404 U. S. 55 (1971); *Construction Laborers* v. *Curry,* 371 U. S. 542, 549–550 (1963); *Mercantile Nat. Bank* v. *Langdeau,* 371 U. S. 555, 557–558 (1963); *Cohen* v. *Beneficial Ind. Loan Corp., supra,* at 545–546. To be sure, certain of the policy considerations implicated in §§ 1257 and 1291 cases are different from those that are relevant here. Compare *Construction Laborers, supra,* at 550; *Mercantile Nat. Bank, supra,* at 558, with *McKart* v. *United States,* 395 U. S. 185, 193–195 (1969); L. Jaffe, Judicial Control of Administrative Action 424–426 (1965). But the core principle that statutorily created finality requirements should, if possible, be construed so as not to cause crucial collateral claims to be lost and potentially irreparable injuries to be suffered remains applicable.

claim "for other reasons" or upholding it "under other provisions" at the post-termination stage, 422 U. S., at 762, would not answer his constitutional challenge.

We conclude that the denial of Eldridge's request for benefits constitutes a final decision for purposes of § 405 (g) jurisdiction over his constitutional claim. We now proceed to the merits of that claim.[12]

### III

### A

Procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment. The Secretary does not contend that procedural due process is inapplicable to terminations of Social Security disability benefits. He recognizes, as has been implicit in our prior decisions, e. g., *Richardson* v. *Belcher,* 404 U. S. 78, 80–81 (1971); *Richardson* v. *Perales,* 402 U. S. 389, 401–402 (1971); *Flemming* v. *Nestor,* 363 U. S. 603, 611 (1960), that the interest of an individual in continued receipt of these benefits is a statutorily created "property" interest protected by the Fifth Amendment. Cf. *Arnett* v. *Kennedy,* 416 U. S. 134, 166 (POWELL, J., concurring in part) (1974); *Board of Regents* v. *Roth,* 408 U. S. 564, 576–578 (1972); *Bell* v. *Burson,* 402 U. S., at 539; *Goldberg* v. *Kelly,* 397 U. S., at 261–262. Rather, the Secretary contends that the existing administrative procedures, detailed below, provide all the proc-

---

[12] Given our conclusion that jurisdiction in the District Court was proper under § 405 (g), we find it unnecessary to consider Eldridge's contention that notwithstanding § 405 (h) there was jurisdiction over his claim under the mandamus statute, 28 U. S. C. § 1361, or the Administrative Procedure Act, 5 U. S. C. § 701 *et seq.*

ess that is constitutionally due before a recipient can be deprived of that interest.

This Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest. *Wolff* v. *McDonnell,* 418 U. S. 539, 557–558 (1974). See, *e. g., Phillips* v. *Commissioner,* 283 U. S. 589, 596–597 (1931). See also *Dent* v. *West Virginia,* 129 U. S. 114, 124–125 (1889). The "right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society." *Joint Anti-Fascist Comm.* v. *McGrath,* 341 U. S. 123, 168 (1951) (Frankfurter, J., concurring). The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong* v. *Manzo,* 380 U. S. 545, 552 (1965). See *Grannis* v. *Ordean,* 234 U. S. 385, 394 (1914). Eldridge agrees that the review procedures available to a claimant before the initial determination of ineligibility becomes final would be adequate if disability benefits were not terminated until after the evidentiary hearing stage of the administrative process. The dispute centers upon what process is due prior to the initial termination of benefits, pending review.

In recent years this Court increasingly has had occasion to consider the extent to which due process requires an evidentiary hearing prior to the deprivation of some type of property interest even if such a hearing is provided thereafter. In only one case, *Goldberg* v. *Kelly,* 397 U. S., at 266–271, has the Court held that a hearing closely approximating a judicial trial is necessary. In other cases requiring some type of pretermination hearing as a matter of constitutional right the Court has spoken sparingly about the requisite procedures. *Snia-*

*dach* v. *Family Finance Corp.,* 395 U. S. 337 (1969), involving garnishment of wages, was entirely silent on the matter. In *Fuentes* v. *Shevin,* 407 U. S., at 96–97, the Court said only that in a replevin suit between two private parties the initial determination required something more than an *ex parte* proceeding before a court clerk. Similarly, *Bell* v. *Burson, supra,* at 540, held, in the context of the revocation of a state-granted driver's license, that due process required only that the prerevocation hearing involve a probable-cause determination as to the fault of the licensee, noting that the hearing "need not take the form of a full adjudication of the question of liability." See also *North Georgia Finishing, Inc.* v. *Di-Chem, Inc.,* 419 U. S. 601, 607 (1975). More recently, in *Arnett* v. *Kennedy, supra,* we sustained the validity of procedures by which a federal employee could be dismissed for cause. They included notice of the action sought, a copy of the charge, reasonable time for filing a written response, and an opportunity for an oral appearance. Following dismissal, an evidentiary hearing was provided. 416 U. S., at 142–146.

These decisions underscore the truism that " '[d]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 895 (1961). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey* v. *Brewer,* 408 U. S. 471, 481 (1972). Accordingly, resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected. *Arnett* v. *Kennedy, supra,* at 167–168 (POWELL, J., concurring in part); *Goldberg* v. *Kelly, supra,* at 263–266; *Cafeteria Workers* v. *McElroy, supra,* at 895. More precisely, our prior de-

cisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. See, e. g., Goldberg v. Kelly, supra, at 263–271.

We turn first to a description of the procedures for the termination of Social Security disability benefits, and thereafter consider the factors bearing upon the constitutional adequacy of these procedures.

## B

The disability insurance program is administered jointly by state and federal agencies. State agencies make the initial determination whether a disability exists, when it began, and when it ceased. 42 U. S. C. § 421 (a).[13] The standards applied and the procedures followed are prescribed by the Secretary, see § 421 (b), who has delegated his responsibilities and powers under the Act to the SSA. See 40 Fed. Reg. 4473 (1975).

---

[13] In all but six States the state vocational rehabilitation agency charged with administering the state plan under the Vocational Rehabilitation Act of 1920, 41 Stat. 735, as amended, 29 U. S. C. § 701 et seq. (1970 ed., Supp. III), acts as the "state agency" for purposes of the disability insurance program. Staff of the House Committee on Ways and Means, Report on the Disability Insurance Program, 93d Cong., 2d Sess., 148 (1974). This assignment of responsibility was intended to encourage rehabilitation contacts for disabled workers and to utilize the well-established relationships of the local rehabilitation agencies with the medical profession. H. R. Rep. No. 1698, 83d Cong., 2d Sess., 23–24 (1954).

In order to establish initial and continued entitlement to disability benefits a worker must demonstrate that he is unable

> "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U. S. C. § 423 (d)(1)(A).

To satisfy this test the worker bears a continuing burden of showing, by means of "medically acceptable clinical and laboratory diagnostic techniques," § 423 (d)(3), that he has a physical or mental impairment of such severity that

> "he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." § 423 (d)(2)(A).[14]

The principal reasons for benefits terminations are that the worker is no longer disabled or has returned to work. As Eldridge's benefits were terminated because he was determined to be no longer disabled, we consider only the sufficiency of the procedures involved in such cases.[15]

---

[14] Work which "exists in the national economy" is in turn defined as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." § 423 (d)(2)(A).

[15] Because the continuing-disability investigation concerning whether a claimant has returned to work is usually done directly by the SSA Bureau of Disability Insurance, without any state agency involvement, the administrative procedures prior to the post-termina-

The continuing-eligibility investigation is made by a state agency acting through a "team" consisting of a physician and a nonmedical person trained in disability evaluation. The agency periodically communicates with the disabled worker, usually by mail—in which case he is sent a detailed questionnaire—or by telephone, and requests information concerning his present condition, including current medical restrictions and sources of treatment, and any additional information that he considers relevant to his continued entitlement to benefits. CM § 6705.1; Disability Insurance State Manual (DISM) § 353.3 (TL No. 137, Mar. 5, 1975).[16]

Information regarding the recipient's current condition is also obtained from his sources of medical treatment. DISM § 353.4. If there is a conflict between the information provided by the beneficiary and that obtained from medical sources such as his physician, or between two sources of treatment, the agency may arrange for an examination by an independent consulting physician.[17] *Ibid.* Whenever the agency's tentative assessment of the beneficiary's condition differs from his

---

tion evidentiary hearing differ from those involved in cases of possible medical recovery. They are similar, however, in the important respect that the process relies principally on written communications and there is no provision for an evidentiary hearing prior to the cutoff of benefits. Due to the nature of the relevant inquiry in certain types of cases, such as those involving self-employment and agricultural employment, the SSA office nearest the beneficiary conducts an oral interview of the beneficiary as part of the pretermination process. SSA Claims Manual (CM) § 6705.2 (c).

[16] Information is also requested concerning the recipient's belief as to whether he can return to work, the nature and extent of his employment during the past year, and any vocational services he is receiving.

[17] All medical-source evidence used to establish the absence of continuing disability must be in writing, with the source properly identified. DISM § 353.4C.

own assessment, the beneficiary is informed that benefits may be terminated, provided a summary of the evidence upon which the proposed determination to terminate is based, and afforded an opportunity to review the medical reports and other evidence in his case file.[18] He also may respond in writing and submit additional evidence. *Id.,* § 353.6.

The state agency then makes its final determination, which is reviewed by an examiner in the SSA Bureau of Disability Insurance. 42 U. S. C. § 421 (c); CM §§ 6701 (b), (c).[19] If, as is usually the case, the SSA accepts the agency determination it notifies the recipient in writing, informing him of the reasons for the decision, and of his right to seek *de novo* reconsideration by the state agency. 20 CFR §§ 404.907, 404.909 (1975).[20] Upon acceptance by the SSA, benefits are terminated effective two months after the month in which medical recovery is found to have occurred. 42 U. S. C. § 423 (a) (1970 ed., Supp. III).

---

[18] The disability recipient is not permitted personally to examine the medical reports contained in his file. This restriction is not significant since he is entitled to have any representative of his choice, including a lay friend or family member, examine all medical evidence. CM § 7314. See also 20 CFR § 401.3 (a)(2) (1975). The Secretary informs us that this curious limitation is currently under review.

[19] The SSA may not itself revise the state agency's determination in a manner more favorable to the beneficiary. If, however, it believes that the worker is still disabled, or that the disability lasted longer than determined by the state agency, it may return the file to the agency for further consideration in light of the SSA's views. The agency is free to reaffirm its original assessment.

[20] The reconsideration assessment is initially made by the state agency, but usually not by the same persons who considered the case originally. R. Dixon, Social Security Disability and Mass Justice 32 (1973). Both the recipient and the agency may adduce new evidence.

If the recipient seeks reconsideration by the state agency and the determination is adverse, the SSA reviews the reconsideration determination and notifies the recipient of the decision. He then has a right to an evidentiary hearing before an SSA administrative law judge. 20 CFR §§ 404.917, 404.927 (1975). The hearing is nonadversary, and the SSA is not represented by counsel. As at all prior and subsequent stages of the administrative process, however, the claimant may be represented by counsel or other spokesmen. § 404.934. If this hearing results in an adverse decision, the claimant is entitled to request discretionary review by the SSA Appeals Council, § 404.945, and finally may obtain judicial review. 42 U. S. C. § 405 (g); 20 CFR § 404.951 (1975).[21]

Should it be determined at any point after termination of benefits, that the claimant's disability extended beyond the date of cessation initially established, the worker is entitled to retroactive payments. 42 U. S. C. § 404. Cf. § 423 (b); 20 CFR §§ 404.501, 404.503, 404.504 (1975). If, on the other hand, a beneficiary receives any payments to which he is later determined not to be entitled, the statute authorizes the Secretary to attempt to recoup these funds in specified circumstances. 42 U. S. C. § 404.[22]

### C

Despite the elaborate character of the administrative procedures provided by the Secretary, the courts

---

[21] Unlike all prior levels of review, which are *de novo,* the district court is required to treat findings of fact as conclusive if supported by substantial evidence. 42 U. S. C. § 405 (g).

[22] The Secretary may reduce other payments to which the beneficiary is entitled, or seek the payment of a refund, unless the beneficiary is "without fault" and such adjustment or recovery would defeat the purposes of the Act or be "against equity and good conscience." 42 U. S. C. § 404 (b). See generally 20 CFR §§ 404.501–404.515 (1975).

below held them to be constitutionally inadequate, concluding that due process requires an evidentiary hearing prior to termination. In light of the private and governmental interests at stake here and the nature of the existing procedures, we think this was error.

Since a recipient whose benefits are terminated is awarded full retroactive relief if he ultimately prevails, his sole interest is in the uninterrupted receipt of this source of income pending final administrative decision on his claim. His potential injury is thus similar in nature to that of the welfare recipient in *Goldberg,* see 397 U. S., at 263–264, the nonprobationary federal employee in *Arnett,* see 416 U. S., at 146, and the wage earner in *Sniadach.* See 395 U. S., at 341–342.[23]

Only in *Goldberg* has the Court held that due process requires an evidentiary hearing prior to a temporary deprivation. It was emphasized there that welfare assistance is given to persons on the very margin of subsistence:

> "The crucial factor in this context—a factor not present in the case of . . . virtually anyone else whose governmental entitlements are ended—is that termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits." 397 U. S., at 264 (emphasis in original).

Eligibility for disability benefits, in contrast, is not based upon financial need.[24]  Indeed, it is wholly unrelated to

---

[23] This, of course, assumes that an employee whose wages are garnisheed erroneously is subsequently able to recover his back wages.

[24] The level of benefits is determined by the worker's average monthly earnings during the period prior to disability, his age, and other factors not directly related to financial need, specified in 42 U. S. C. § 415 (1970 ed., Supp. III). See § 423 (a)(2).

the worker's income or support from many other sources, such as earnings of other family members, workmen's compensation awards,[25] tort claims awards, savings, private insurance, public or private pensions, veterans' benefits, food stamps, public assistance, or the "many other important programs, both public and private, which contain provisions for disability payments affecting a substantial portion of the work force . . . ." *Richardson* v. *Belcher,* 404 U. S., at 85–87 (Douglas, J., dissenting). See Staff of the House Committee on Ways and Means, Report on the Disability Insurance Program, 93d Cong., 2d Sess., 9–10, 419–429 (1974) (hereinafter Staff Report).

As *Goldberg* illustrates, the degree of potential deprivation that may be created by a particular decision is a factor to be considered in assessing the validity of any administrative decisionmaking process. Cf. *Morrissey* v. *Brewer,* 408 U. S. 471 (1972). The potential deprivation here is generally likely to be less than in *Goldberg,* although the degree of difference can be overstated. As the District Court emphasized, to remain eligible for benefits a recipient must be "unable to engage in substantial gainful activity." 42 U. S. C. § 423; 361 F. Supp., at 523. Thus, in contrast to the discharged federal employee in *Arnett,* there is little possibility that the terminated recipient will be able to find even temporary employment to ameliorate the interim loss.

As we recognized last Term in *Fusari* v. *Steinberg,* 419 U. S. 379, 389 (1975), "the possible length of wrongful deprivation of . . . benefits [also] is an important factor in assessing the impact of official action on the private interests." The Secretary concedes that the delay between

---

[25] Workmen's compensation benefits are deducted in part in accordance with a statutory formula. 42 U. S. C. § 424a (1970 ed., Supp. III); 20 CFR § 404.408 (1975); see *Richardson* v. *Belcher,* 404 U. S. 78 (1971).

342

a request for a hearing before an administrative law judge and a decision on the claim is currently between 10 and 11 months. Since a terminated recipient must first obtain a reconsideration decision as a prerequisite to invoking his right to an evidentiary hearing, the delay between the actual cutoff of benefits and final decision after a hearing exceeds one year.

In view of the torpidity of this administrative review process, cf. *id.*, at 383–384, 386, and the typically modest resources of the family unit of the physically disabled worker,[26] the hardship imposed upon the erroneously terminated disability recipient may be significant. Still, the disabled worker's need is likely to be less than that of a welfare recipient. In addition to the possibility of access to private resources, other forms of government assistance will become available where the termination of disability benefits places a worker or his family below the subsistence level.[27] See *Arnett* v. *Kennedy*, 416 U. S.,

---

[26] *Amici* cite statistics compiled by the Secretary which indicate that in 1965 the mean income of the family unit of a disabled worker was $3,803, while the median income for the unit was $2,836. The mean liquid assets—*i. e.*, cash, stocks, bonds—of these family units was $4,862; the median was $940. These statistics do not take into account the family unit's nonliquid assets—*i. e.*, automobile, real estate, and the like. Brief for AFL–CIO et al. as *Amici Curiae* App. 4a. See n. 29, *infra*.

[27] *Amici* emphasize that because an identical definition of disability is employed in both the Title II Social Security Program and in the companion welfare system for the disabled, Supplemental Security Income (SSI), compare 42 U. S. C. § 423 (d)(1) with § 1382c (a)(3) (1970 ed., Supp. III), the terminated disability-benefits recipient will be ineligible for the SSI Program. There exist, however, state and local welfare programs which may supplement the worker's income. In addition, the worker's household unit can qualify for food stamps if it meets the financial need requirements. See 7 U. S. C. §§ 2013 (c), 2014 (b); 7 CFR § 271 (1975). Finally, in 1974 480,000 of the approximately 2,000,000 disabled workers receiving Social Security benefits also received SSI benefits. Since fi-

at 169 (POWELL, J., concurring in part); *id.*, at 201–202 (WHITE, J., concurring in part and dissenting in part). In view of these potential sources of temporary income, there is less reason here than in *Goldberg* to depart from the ordinary principle, established by our decisions, that something less than an evidentiary hearing is sufficient prior to adverse administrative action.

### D

An additional factor to be considered here is the fairness and reliability of the existing pretermination procedures, and the probable value, if any, of additional procedural safeguards. Central to the evaluation of any administrative process is the nature of the relevant inquiry. See *Mitchell* v. *W. T. Grant Co.*, 416 U. S. 600, 617 (1974); Friendly, Some Kind of Hearing, 123 U. Pa. L. Rev. 1267, 1281 (1975). In order to remain eligible for benefits the disabled worker must demonstrate by means of "medically acceptable clinical and laboratory diagnostic techniques," 42 U. S. C. § 423 (d)(3), that he is unable "to engage in any substantial gainful activity by reason of any *medically determinable* physical or mental impairment . . . ." § 423 (d)(1)(A) (emphasis supplied). In short, a medical assessment of the worker's physical or mental condition is required. This is a more sharply focused and easily documented decision than the typical determination of welfare entitlement. In the latter case, a wide variety of information may be deemed relevant, and issues of witness credibility and

---

nancial need is a criterion for eligibility under the SSI program, those disabled workers who are most in need will in the majority of cases be receiving SSI benefits when disability insurance aid is terminated. And, under the SSI program, a pretermination evidentiary hearing is provided, if requested. 42 U. S. C. § 1383 (c) (1970 ed., Supp. III); 20 CFR § 416.1336 (c) (1975); 40 Fed. Reg. 1512 (1975); see Staff Report 346.

veracity often are critical to the decisionmaking process. *Goldberg* noted that in such circumstances "written submissions are a wholly unsatisfactory basis for decision." 397 U. S., at 269.

By contrast, the decision whether to discontinue disability benefits will turn, in most cases, upon "routine, standard, and unbiased medical reports by physician specialists," *Richardson* v. *Perales*, 402 U. S., at 404, concerning a subject whom they have personally examined.[28] In *Richardson* the Court recognized the "reliability and probative worth of written medical reports," emphasizing that while there may be "professional disagreement with the medical conclusions" the "specter of questionable credibility and veracity is not present." *Id.*, at 405, 407. To be sure, credibility and veracity may be a factor in the ultimate disability assessment in some cases. But procedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions. The potential value of an evidentiary hearing, or even oral presentation to the decision-

---

[28] The decision is not purely a question of the accuracy of a medical diagnosis since the ultimate issue which the state agency must resolve is whether in light of the particular worker's "age, education, and work experience" he cannot "engage in any . . . substantial gainful work which exists in the national economy . . . ." 42 U. S. C. § 423 (d) (2) (A). Yet information concerning each of these worker characteristics is amenable to effective written presentation. The value of an evidentiary hearing, or even a limited oral presentation, to an accurate presentation of those factors to the decisionmaker does not appear substantial. Similarly, resolution of the inquiry as to the types of employment opportunities that exist in the national economy for a physically impaired worker with a particular set of skills would not necessarily be advanced by an evidentiary hearing. Cf. 1 K. Davis, Administrative Law Treatise § 7.06, p. 429 (1958). The statistical information relevant to this judgment is more amenable to written than to oral presentation.

maker, is substantially less in this context than in *Goldberg*.

The decision in *Goldberg* also was based on the Court's conclusion that written submissions were an inadequate substitute for oral presentation because they did not provide an effective means for the recipient to communicate his case to the decisionmaker. Written submissions were viewed as an unrealistic option, for most recipients lacked the "educational attainment necessary to write effectively" and could not afford professional assistance. In addition, such submissions would not provide the "flexibility of oral presentations" or "permit the recipient to mold his argument to the issues the decision maker appears to regard as important." 397 U. S., at 269. In the context of the disability-benefits-entitlement assessment the administrative procedures under review here fully answer these objections.

The detailed questionnaire which the state agency periodically sends the recipient identifies with particularity the information relevant to the entitlement decision, and the recipient is invited to obtain assistance from the local SSA office in completing the questionnaire. More important, the information critical to the entitlement decision usually is derived from medical sources, such as the treating physician. Such sources are likely to be able to communicate more effectively through written documents than are welfare recipients or the lay witnesses supporting their cause. The conclusions of physicians often are supported by X-rays and the results of clinical or laboratory tests, information typically more amenable to written than to oral presentation. Cf. W. Gellhorn & C. Byse, Administrative Law—Cases and Comments 860–863 (6th ed. 1974).

A further safeguard against mistake is the policy of allowing the disability recipient's representative full ac-

cess to all information relied upon by the state agency. In addition, prior to the cutoff of benefits the agency informs the recipient of its tentative assessment, the reasons therefor, and provides a summary of the evidence that it considers most relevant. Opportunity is then afforded the recipient to submit additional evidence or arguments, enabling him to challenge directly the accuracy of information in his file as well as the correctness of the agency's tentative conclusions. These procedures, again as contrasted with those before the Court in *Goldberg,* enable the recipient to "mold" his argument to respond to the precise issues which the decisionmaker regards as crucial.

Despite these carefully structured procedures, *amici* point to the significant reversal rate for appealed cases as clear evidence that the current process is inadequate. Depending upon the base selected and the line of analysis followed, the relevant reversal rates urged by the contending parties vary from a high of 58.6% for appealed reconsideration decisions to an overall reversal rate of only 3.3%.[29] Bare statistics rarely provide a satisfactory measure of the fairness of a decisionmaking process. Their adequacy is especially suspect here since

---

[29] By focusing solely on the reversal rate for appealed reconsideration determinations *amici* overstate the relevant reversal rate. As we indicated last Term in *Fusari* v. *Steinberg,* 419 U. S. 379, 383 n. 6 (1975), in order fully to assess the reliability and fairness of a system of procedure, one must also consider the overall rate of error for all denials of benefits. Here that overall rate is 12.2%. Moreover, about 75% of these reversals occur at the reconsideration stage of the administrative process. Since the median period between a request for reconsideration review and decision is only two months, Brief for AFL–CIO et al. as *Amici Curiae* App. 4a, the deprivation is significantly less than that concomitant to the lengthier delay before an evidentiary hearing. Netting out these reconsideration reversals, the overall reversal rate falls to 3.3%. See Supplemental and Reply Brief for Petitioner 14.

the administrative review system is operated on an open-file basis. A recipient may always submit new evidence, and such submissions may result in additional medical examinations. Such fresh examinations were held in approximately 30% to 40% of the appealed cases in fiscal 1973, either at the reconsideration or evidentiary hearing stage of the administrative process. Staff Report 238. In this context, the value of reversal rate statistics as one means of evaluating the adequacy of the pretermination process is diminished. Thus, although we view such information as relevant, it is certainly not controlling in this case.

## E

In striking the appropriate due process balance the final factor to be assessed is the public interest. This includes the administrative burden and other societal costs that would be associated with requiring, as a matter of constitutional right, an evidentiary hearing upon demand in all cases prior to the termination of disability benefits. The most visible burden would be the incremental cost resulting from the increased number of hearings and the expense of providing benefits to ineligible recipients pending decision. No one can predict the extent of the increase, but the fact that full benefits would continue until after such hearings would assure the exhaustion in most cases of this attractive option. Nor would the theoretical right of the Secretary to recover undeserved benefits result, as a practical matter, in any substantial offset to the added outlay of public funds. The parties submit widely varying estimates of the probable additional financial cost. We only need say that experience with the constitutionalizing of government procedures suggests that the ultimate additional cost in terms of money and administrative burden would not be insubstantial.

Financial cost alone is not a controlling weight in determining whether due process requires a particular procedural safeguard prior to some administrative decision. But the Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources is a factor that must be weighed. At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost. Significantly, the cost of protecting those whom the preliminary administrative process has identified as likely to be found undeserving may in the end come out of the pockets of the deserving since resources available for any particular program of social welfare are not unlimited. See Friendly, *supra,* 123 U. Pa. L. Rev., at 1276, 1303.

But more is implicated in cases of this type than ad hoc weighing of fiscal and administrative burdens against the interests of a particular category of claimants. The ultimate balance involves a determination as to when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness. We reiterate the wise admonishment of Mr. Justice Frankfurter that differences in the origin and function of administrative agencies "preclude wholesale transplantation of the rules of procedure, trial, and review which have evolved from the history and experience of courts." *FCC* v. *Pottsville Broadcasting Co.,* 309 U. S. 134, 143 (1940). The judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances. The essence of due process is the requirement that "a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it." *Joint Anti-Fascist Comm.* v. *McGrath,* 341 U. S., at 171–172 (Frank-

furter, J., concurring). All that is necessary is that the procedures be tailored, in light of the decision to be made, to "the capacities and circumstances of those who are to be heard," *Goldberg* v. *Kelly,* 397 U. S., at 268–269 (footnote omitted), to insure that they are given a meaningful opportunity to present their case. In assessing what process is due in this case, substantial weight must be given to the good-faith judgments of the individuals charged by Congress with the administration of social welfare programs that the procedures they have provided assure fair consideration of the entitlement claims of individuals. See *Arnett* v. *Kennedy,* 416 U. S., at 202 (WHITE, J., concurring in part and dissenting in part). This is especially so where, as here, the prescribed procedures not only provide the claimant with an effective process for asserting his claim prior to any administrative action, but also assure a right to an evidentiary hearing, as well as to subsequent judicial review, before the denial of his claim becomes final. Cf. *Boddie* v. *Connecticut,* 401 U. S. 371, 378 (1971).

We conclude that an evidentiary hearing is not required prior to the termination of disability benefits and that the present administrative procedures fully comport with due process.

The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL concurs, dissenting.

For the reasons stated in my dissenting opinion in *Richardson* v. *Wright,* 405 U. S. 208, 212 (1972), I agree with the District Court and the Court of Appeals that, prior to termination of benefits, Eldridge must be af-

forded an evidentiary hearing of the type required for welfare beneficiaries under Title IV of the Social Security Act, 42 U. S. C. § 601 *et seq.* See *Goldberg* v. *Kelly,* 397 U. S. 254 (1970). I would add that the Court's consideration that a discontinuance of disability benefits may cause the recipient to suffer only a limited deprivation is no argument. It is speculative. Moreover, the very legislative determination to provide disability benfits, without any prerequisite determination of need in fact, presumes a need by the recipient which is not this Court's function to denigrate. Indeed, in the present case, it is indicated that because disability benefits were terminated there was a foreclosure upon the Eldridge home and the family's furniture was repossessed, forcing Eldridge, his wife, and their children to sleep in one bed. Tr. of Oral Arg. 39, 47–48. Finally, it is also no argument that a worker, who has been placed in the untenable position of having been denied disability benefits, may still seek other forms of public assistance.