Robert E. VARNER, Plaintiff,

v.

Kathryn T. BARD, Jane O. Stover, and
Katherine K. Kopp, Defendants.

Civ. No. 84–1672.

United States District Court,
M.D. Pennsylvania.

Dec. 3, 1985.

Robert Varner pro se.

Gordon A. Roe, Sol., York Co., and John D. Miller, Sol., Domestic Relations, York, Pa., for defendants.

## MEMORANDUM

HERMAN, District Judge.

Plaintiff Varner, proceeding *pro se* in this § 1983 action, challenges the constitutionality of the procedures by which his wages were attached to satisfy an outstanding child support order. After this court twice directed plaintiff to file amended complaints, we then addressed and denied in part defendant's motion to dismiss and subsequent motion for judgment on the pleadings. The case is now before us on defendants' motion for summary judgment.

Although plaintiff's complaint is not a model of clarity, we held in our April 24, 1985 opinion in this matter that Varner may have alleged a valid claim under 42 U.S.C. § 1983 concerning his procedural due process rights. The gravaman of his complaint appears to be that the attachment order was not properly issued by a court, and that he received neither notice of the order nor an opportunity to have a hearing prior to the entry of the order. The material facts of this case concerning

which there is no dispute are drawn from the depositions submitted by the parties in support of their motion and are set forth below.

## I. FACTS

The history of this case begins in January, 1975, when the York County Court of Common Pleas entered its first support order against Robert Varner. Varner failed to make regular payments to the Domestic Relations Office, as required by the order, accumulating arrears of $19,072.36 by June, 1981. On June 25, 1981, the ongoing support order was modified at a support hearing before a Domestic Relations Office hearing officer by consent of the parties. From that date on, Varner was directed to pay $25 per week in child support, and $5 per week on account of the arrearages. Varner signed the June 25, 1981 support order, along with his former wife. The order was then stamped with the signature of James E. Buckingham, the York County judge in charge of support matters. Neither Varner nor his former wife appealed this support order.

Varner made payments pursuant to the June 25, 1981 order until September 5, 1981. After that date, the Domestic Relations Office received no further payments from Varner on his outstanding support obligation.

In January, 1982, the Domestic Relations Office sent Varner a year-end statement of his account along with a flier indicating that wage attachments would be issued after an arrearage of thirty days had accumulated. The year-end statement was returned to the Domestic Relations Office because the post office box to which it was addressed had been closed. The Office resent the statement and flier to Varner's last known residence. This time it was not returned. Mr. Varner acknowledges the receipt of year-end statements, but does not remember if he received one for 1981 in particular.

On December 20, 1982, the Domestic Relations Office sent an order to Mr. Varner's employer ordering the attachment of Varner's wages in the amount of $30.20 per week; $25 on the support order, $5 on the arrears, and $.20 service charge. On the same day, the Office sent a copy of the attachment order to Mr. Varner himself. The order was signed by Judge Buckingham by means of a signature stamp affixed to the order by the Domestic Relations Office staff. This procedure of stamping Judge Buckingham's signature to support and attachment orders was fully authorized by the Judge and pursuant to a long standing oral direction of the Judge.

On receipt of the notice of attachment, Varner took no action to challenge the court's order, nor to obtain relief from the attachment, until the filing of this federal action in December, 1984.

## II. DISCUSSION

A. The Attachment Order.

The first issue we must address in determining the constitutionality of the attachment of Varner's wages is the validity of the attachment order itself. If the attachment order was not in fact issued by a court, as Varner alleges, then the attachment violates not only due process, but also the procedures outlined for attachments in the Pennsylvania Rules of Civil Procedure, Rule 1910.22(a).

All parties agree that Judge Buckingham's signature was affixed to the order by the Domestic Relations Office using a rubber stamp. Judge Buckingham testified in his deposition that "I supplied the Domestic Relations Office with a stamp with my actual signature on it, which they use to sign orders for any wage attachments or any other ministerial order ... the office has the authority to use my stamp to commence wage attachment proceedings." Buckingham Deposition at 8. These proceedings are initiated, according to Buckingham's direction to the Domestic Relations Office, when support payments become over 30 days in arrears. Buckingham has directed that proceedings be initiated in all cases, with no exceptions or exemptions; the Office has absolutely no

discretion over whose wages will be attached and whose will not be.

Although we have been pointed to no case or statutory authority that ratifies the arrangement worked out between Judge Buckingham and Domestic Relations, we believe that the procedures are legitimate and that the orders "signed" by Judge Buckingham are constitutionally and procedurally valid. It is within Judge Buckingham's power as a judge to direct the Office to perform certain ministerial tasks, as long as those tasks are truly ministerial, and as long as there is explicit direction to the Office concerning their duties and the parameters of their authority. We hold that both of these conditions are present in this case. We therefore also hold that the attachment order is a valid court order.

### B. Procedural Due Process.

In addition to attacking the validity of the attachment order itself, Varner alleges that he has not been afforded the process that is due him under the Fourteenth Amendment of the United States Constitution. Varner complains that his lack of prior notice and prior opportunity for a hearing render the attachment procedures, and hence the attachment itself, unconstitutional.

The United States Supreme Court has repeatedly held that due process is a flexible requirement, and that the contours of due process in a given situation depend on (1) "the private interest that will be affected by the official action", (2) "the risk of an erroneous deprivation of such interest through the procedures used," (3) "the probable value, if any, of additional or substitute procedural safeguards," and (4) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 334–335, 96 S.Ct. 893, 902–903, 47 L.Ed.2d 18 (1976).

The leading authority in this circuit on the due process requirements in an attachment or garnishment proceeding is *Finberg v. Sullivan*, 634 F.2d 50 (3d Cir.1980). In that case, plaintiff's bank accounts containing only the proceeds from her social security retirement benefits check were attached to satisfy a default judgment. The money in these accounts was entirely exempt from attachment and garnishment by virtue of the Social Security Act, 42 U.S.C. § 407 (1976). The court in *Finberg* held that the Pennsylvania post-judgment garnishment procedures did not provide the due process of law required by the Fourteenth Amendment. The procedures afforded neither a prompt postseizure hearing at which plaintiff could assert exemptions, nor notice that exemptions may apply. Both of these elements were required by the circumstances of the case, the court ruled.

Although the *Finberg* court held that due process requires a prompt postseizure hearing (less than fifteen days after the seizure) and notice of possible exemptions in a post-judgment garnishment situation, we do not believe that these requirements automatically apply to attachment of wages to satisfy support orders. The *Finberg* court relied heavily on the provisional nature of the post-judgment garnishment and on the availability of a wide range of exemptions:

> Sterling's judgment represents only an adjudication of Mrs. Finberg's liability on a monetary debt, not a transfer to Sterling of title to any particular item of her property.... A debtor might still defeat that right with any of a number of defenses not adjudicated in the action on the merits, such as in the present case with a claim of exemption. Thus, the attachment remains a provisional measure, and the debtor retains a protectable interest in the use of her property during the pendency of the creditor's action.

634 F.2d at 58. Because of the provisional nature of post-judgment garnishments and the potential applicability of exemptions, more procedural protections were warranted to protect the debtor's interest in her property than were afforded by Pennsylvania garnishment procedures.

There are great differences between a support order and a judgment, however.

As the *Finberg* court noted, a judgment is merely an adjudication of liability on a monetary debt. A support order, while also creating a monetary debt, is the result of a more far reaching inquiry. A judgment, normally, is the result of a legal and factual determination that one party owes another a certain sum of money. The sum is arrived at by analyzing the facts surrounding a certain past transaction or occurrence, and typically involves no determination of the debtor's assets or capacity to satisfy the debt. A support order, on the other hand, is a product of either an agreement of the parties, or a determination of the child's needs and the parents' ability to pay. *Commonwealth ex rel Mainzer v. Audi*, 266 Pa.Super. 122, 403 A.2d 124 (1979). Because the court or Domestic Relations Office hearing officer considers the type and amount of the parent's income and assets in determining the amount of support to be paid to the custodial parent, and because the income is assessed again before issuance of the attachment order, it is also highly unlikely that any exemptions or other defenses would apply to a subsequent attachment of wages.

Because of these differences between the typical post-judgment garnishment action and an action to attach wages to satisfy a support order, we decline to rule that the same type of notice and hearing are required to satisfy due process in both situations. *Finberg* is therefore not controlling in this case, and we must proceed with the four part balancing analysis of *Mathews v. Eldridge, supra.*

The first element of the four part analysis is the determination of what private interest is affected by the attachment of wages to satisfy a support order. It should be noted at the outset of this inquiry that the constitutionality of the support order itself is not in question, nor could it be. Varner consented to entry of that order in the amount of $30 per week. By consenting to the entry of the order, Varner acknowledged his legal duty to pay that sum of money, through the Domestic Relations Office, to his former wife for the support of his son. Given this legal duty, Varner's only conceivable interest that is affected by the attachment is his interest in voluntarily paying the sum, rather than having it automatically withheld from his paycheck. While this interest at first blush seems insignificant, it must be acknowledged that automatic withholding may disrupt the way Varner organizes his finances, and it does wrest control of the withheld money from his hands. Even though Varner is under a duty to pay the withheld sums to his former wife, until he does so, absent the withholding, that money remains his own property.

Even though we do find a minimal property interest that is worth protecting, we do not find that Varner's interest in subsistence is affected. Varner's weekly income was considered before the support order was entered, and he was found to be able to pay $30 per week. Varner's weekly income was again considered before issuance of the attachment order, and the amount directed to be withheld was again based on the amount Varner could afford to pay, given his then current wages. *See*, Pa.R.Civ.P. 1910.22(b).

The second element to be weighed in the balance is the risk of an erroneous deprivation of the affected interest. The only conceivable errors are that the wages might be attached when the defendant in the support matter was not in fact over 30 days in arrears, or that the employer might be ordered to withhold too large an amount. The second error is far more serious than the first, and is certainly a possibility. The risk of such an error is slim, however, given that the rules covering such attachments provide for computation of the amount to be withheld based on the "evidence of defendant's wages, salary and commissions then in the record of the action," and for a recalculation of the amount to be withheld based on an up-to-date report of the amount of defendant's wages filed by the employer within 10 days after service of the attachment order. Pa.R. Civ.P. 1910.22(b) and (c).

The third element of the analysis is a determination of the probable value, if any, of additional or substitute procedural safe-

guards. The existing system already provides a certain amount of procedural checks and balances. First, before a wage attachment is ordered, the amount of wages to be withheld by the employer is computed on the basis of defendant's weekly salary as evidenced in the Domestic Relations Office files. Second, after the order is issued, the employer files an up-to-date report of defendant's wages and the court or Office again computes the amount of the attachment. Third, if a defendant wishes to dispute the attachment, or the amount thereof, he may file a preliminary objection pursuant to Pa.R.C.P. 3142, or he may move for a stay of proceedings pursuant to Rule 1910.24. Plaintiff seems to suggest that due process requires a hearing prior to issuance of the attachment order. While it is true that such a hearing would establish definitively whether defendant in the support action is in arrears and would also give a chance to evaluate, based on defendant's own testimony, how much defendant could afford to pay, we believe that a full blown hearing would not significantly diminish any risk of error that exists. Domestic Relations and the court already have before them, prior to the issuance of the attachment order, evidence of defendant's payment or non-payment of support and evidence of defendant's wages. Further, in the case of an actual error, defendant, under the current system, can immediately apply for a stay and thereby protect his interests.

The final step in the four part balancing analysis is to evaluate "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903. The director of the York County Domestic . Relations Office testified at her deposition that the Domestic Relations Office initiates as many as 94 new involuntary wage attachments per month. Mandating that the Office or the court actually hold a hearing prior to or immediately after all 94 attachments would greatly increase the administrative burdens of the Office and quite likely would force the Office to reduce the number of attachments ordered. Such a reduction would greatly harm not only the governmental interest in making sure that defendants obey support orders, but would also harm the society's interest in insuring that children of broken marriages are adequately cared for and do not become public charges. This interest in ensuring support for the children greatly overshadows the interest of defendants in automatically having a hearing before attachment of their wages, especially given the safeguards against error that are already in place. We therefore conclude that Varner's due process right to an opportunity for a hearing has been adequately met by the provision for a post-attachment motion for a stay pursuant to Rule 1910.24.

■ The final issue that we must address is whether Varner was provided adequate notice of the wage attachment. We find that he was. Varner was handed a policies and procedures flier at his support hearing on June 25, 1981. This flier warned that defendant's wages would be attached if there were an accumulation of arrearages of thirty days or more. The Domestic Relations Office also sent Varner a flier in January, 1982, warning him that his wages would be attached. Finally, in December, 1982, Varner was sent a copy of the attachment order. Given all of these notifications, we conclude that Varner had adequate notice of the impending attachment, and if he believed it to be erroneous, he could have objected to Domestic Relations. As it stands, Varner did not challenge the attachment until almost two years later in federal court.

Because we find, based on undisputed facts, that Varner was afforded proper notice and an opportunity to be heard in conformity with the fourteenth amendment of the constitution, we will grant defendants' motion for summary judgment.