TALLMAN, Circuit Judge,
concurring:
I concur in the opinion but write separately to more thoroughly describe the backdrop of the anti-gang injunction at issue and to reiterate why today’s holding is confined to the unique procedural and factual record in this case.
*1073 My colleagues insist that they are “mindful of the great importance of controlling the proliferation of criminal gangs and preventing illegal activity by gang members.” Maj. at 1056. While I do not doubt their sincerity, they devote scant attention in an otherwise comprehensive opinion to explaining why the anti-gang injunction at issue was so vital to City of Orange residents and law enforcement. I write separately to fill that void.
The Orange Varrio Cypress street gang (OVC) is one of the most violent gangs in the City of Orange, California, a suburb of Los Angeles.[1] There is no serious dispute that the enterprise engages in on-going criminal activity involving attempted murders, assaults with deadly weapons, terrorist threats, intimidation of victims and witnesses, illegal possession of firearms, robberies, burglaries, thefts, drug sales, and acts of felony vandalism.
These criminal activities frequently spill over into the community, hurting innocent people. OVC members have robbed and assaulted Chapman University students, beaten up a 13-year-old boy for whistling on his way home from school, and led police on high-speed chases through residential areas. Gang members have stabbed people in the head and back, shot others in the torso and neck, attacked people with bats and pipes, and hit, kicked, and threatened to kill female victims. The gang distributes drugs, using its members to both peddle and stand as lookouts to protect narcotic activity. They also deface community property by painting gang graffiti on buildings, sidewalks, doors, walls, and fences, and etching it into benches, street signs, and glass windows.
Even schools are not immune to the OVC’s violence. The local high school unwillingly plays host to dozens of fights each year between members of the OVC and rival gangs. Still more concerning is that the OVC draws its membership from the pool of pupils attending the same high school, as well as a number of middle schools, to fill its ranks.
Unsurprisingly, many local residents have voiced their concern with the OVC to local law enforcement officers, demanding action to restore law and order to a city whose residents have good reason to fear the OVC’s activities. Many of the complainants live in fear of OVC gang members, and are cautious about using their front yards or even being outside after dark. Still more complain about vandalism, gang graffiti, robberies, and assaults that take place where they live and work. Many citizens are also reluctant to cooperate with police for understandable fear of retaliation, which undoubtedly hinders police efforts to effectively curb gang violence through traditional criminal prosecution.
This is not to say that the OVC is the largest or most dangerous gang in California, or even in Orange County. But this case is emblematic of the legislature’s declaration that California “is in a state of crisis .... caused by violent street gangs whose members threaten, terrorize, and commit a multitude of crimes against the peaceful citizens of their neighborhoods.” CaLPenal Code § 186.21. It also provides *1074 much-needed context for why the Orange County District Attorney’s Office and the Orange Police Department (collectively, Orange) sought and obtained a tough superior court injunction that, as my colleagues put it, “broadly restrict[ed] the covered individuals’ legal daily activities in a prophylactic effort to prevent illegal activities from taking place.” Maj. at 1056.
In conducting our procedural due process analysis, we must take into account the government’s and the public’s interest. Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (instructing us to consider “the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail”). Orange undoubtedly has a vital interest in protecting its community by suppressing gang violence. But as the court observes correctly, our inquiry under this prong in Mathews is not whether Orange has a significant interest in combating gang violence, but rather whether it has a significant interest in failing to provide a pre-deprivation process to challenge Orange’s gang membership allegations.
In my view, this inquiry cannot be severed from Orange’s unsettling and indefensible decision to voluntarily dismiss every individual who tried to challenge the injunction in the state court proceeding, and then serve those same dismissed individuals with the injunction it obtained uncontested. By its own' admission, Orange adopted this strategy in part because of Plaintiffs-Appellees’ “aggressive effort[s]” to “fight” the injunction. Those efforts included several motions and supporting declarations opposing the entry of a preliminary injunction, written discovery requests, and a schedule of 20 depositions. In effect, the district attorney concluded it was costing too much to litigate against well-financed defense lawyers. Ironically, the taxpayers of Orange County now get to pick up a multi-million dollar tab for the litigation that ensued from the district attorney’s bad tactical decision. The type of “aggressive effort[s]” that Orange sought to sidestep come with the territory. If Orange can rely on our judicial system to pursue its injunction, so too can those being targeted by the injunction who seek to resist it.
I thus share my colleagues’ views that “the procedural due process problems raised in this case are of Orange’s own creation” and that “[t]hey stem from Orange’s decision to thwart Plaintiffs’ efforts to use the procedures available in the state court[.]” Maj. at 1050. Indeed, Orange’s dismiss-and-serve strategy is the linchpin to its procedural due process violation because today’s opinion applies only to those individuals whom Orange dismissed and later served.
We need not hold, and I do not read today’s opinion as holding, that the post-deprivation procedural remedies that Orange proffered are constitutionally inadequate as to any other class of individuals. Orange may well have a stronger argument under Mathews ’ governmental and public interest prong if today’s challenge came from individuals who never appeared in the state court proceeding to contest the injunction and who are actually gang members. But this is not the challenge before us. And to stretch today’s holding to individuals who never challenged the injunction in the state court action — whether named in the lawsuit or noL-would effectively force Orange to “bring a new action for injunctive relief against each new member” of the OVC. See People ex rel. Totten v. Colonia Chiques, 156 Cal.App.4th 31, 41, 67 Cal.Rptr.3d 70 (2007). Such a rule would dangerously impede law enforcement efforts to curb unlawful gang activity *1075 where “[gang] membership is continually changing.” See id. Importantly, today’s holding does not reach so far.
In sum, the ideal procedural protection to avoid being inadvertently included in a proposed injunction will often be to seek relief from a neutral judge before the injunction is entered. Orange’s dismiss-and-serve tactic effectively stripped Plaintiffs-Appellees of that opportunity. That strategic maneuver — when combined with the post-deprivation procedural protections that Orange did provide — is what constituted a procedural due process violation of the United States Constitution.
With those observations, I concur in the opinion.

. In providing this overview of the OVC’s activities, I draw primarily from the February 10, 2009, expert declaration submitted by Detective J. Nigro of the Orange Police Department in support of the anti-gang injunction. At the time of his declaration, Detective Nig-ro had been a sworn peace officer for 13 years, had served in the Orange Police Department’s gang unit for six years, had investigated hundreds of gang-related cases, and had interviewed over 1,000 gang participants regarding their gangs, graffiti, tattoos, crimes, families, and gang culture.