**Deanna M. SZABLOWSKI, Petitioner**

v.

**STATE CIVIL SERVICE COMMISSION (PENNSYLVANIA LIQUOR CONTROL BOARD), Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 20, 2013.

Decided Aug. 13, 2013.

Jeffrey R. Elliott, Wyomissing, for petitioner.

Alina L. Andreoli, Assistant Counsel, Harrisburg, for respondent.

BEFORE: PELLEGRINI, President Judge, COHN JUBELIRER, Judge, and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

Deanna M. Szablowski (Employee) petitions for review of an order of the State Civil Service Commission that sustained the decision of the Pennsylvania Liquor Control Board to terminate her employment. Employee argues that her suspension violated due process and that the evidence did not establish just cause for her dismissal. Concluding that the Civil Service Commission's findings of fact are

incomplete or erroneous, we vacate and remand.

In 2005, Employee began her employment with the Liquor Control Board and, in April 2008, was promoted to Liquor Store Clerk 2, *i.e.*, an assistant manager position. She worked as an assistant manager at Store 0608 from August 2009 through September 2011, during which time the store manager and her immediate supervisor was Newton Mull. She and Mull supervised two other employees that made cash register transactions: Dennis Wingle, a full-time Clerk I and Joseph Reedy, a part-time clerk. In 2010, Employee reported her suspicions to Jerome Yeager, the District Manager, that she believed that Mull was stealing from the store by issuing refunds to his credit card. The Office of Auditor General investigated, and Mull was dismissed in January 2011.

In June 2011, Employee went on maternity leave for approximately two months. During her leave, the Liquor Control Board initiated an audit of Store 0608. Employee was suspended without pay on September 21, 2011, and on November 15, 2011, the Board conducted a fact-finding session in which Employee participated. At its conclusion, Employee was discharged for "manipulating" store funds, records or merchandise in violation of Board policies. She was not charged with fraud or theft.

Employee appealed her suspension and discharge to the Civil Service Commission. The Liquor Control Board identified the reasons for her dismissal as follows:

(1) Serious violation of procedure/manipulation of Commonwealth funds/records/merchandise in Store # 0608 despite prior related instruction and training; in that during the period of September 30, 2009 through January

12, 2011, you performed approximately 102 fraudulent/questionable post-voids which resulted in a loss to the Commonwealth of approximately $2,217.89.

(2) Serious violation of procedure in Store # 0608 despite prior related instruction and training; in that during but not limited to the period of September 30, 2009 through January 12, 2011, you improperly completed approximately 51 post-void transactions without having part/all of the required supporting documentation

Reproduced Record at 753a (R.R. ——). These cited incidents all related to the time period when Mull was the manager of Store 0608.

In support of its dismissal of Employee, the Liquor Control Board presented the testimony of Kelly Leonard, one of its auditors. She testified that in July 2011, she reviewed the store records and the clerk performance evaluations. Because of the experience with Mull, she decided to examine records of the other employees at Store 0608. Those records disclosed that between July 2009 and January 2011, Mull's voided sales totaled $22,827.15. By comparison, Wingle's totaled $5,569.52; Reedy's totaled $2,831.73;[1] and Employee's totaled $4,075.39. Leonard decided that Reedy's total was too small to warrant an investigation. Wingle's total prompted an investigation, but he was cleared. However, Leonard's investigation of Employee showed that she had voided 132 sales, and Leonard believed that 102 of those were potentially fraudulent. Leonard concluded that Mull had manipulated "post-void" transactions.

Leonard explained that a "post-void" transaction is done on the cash register to delete a sale. A sale will be deleted

---

1. Because Reedy worked part-time his voided sales would be lower.

where, for example, a customer does not have enough cash to make the purchase or his credit card is declined. Leonard explained that a post-void transaction can be manipulated to facilitate a theft from the cash register. For example, the employee may place cash for a sale in the register and later void the sale and pocket the cash. The cash register drawer will settle at the end of the shift.[2] Under the Liquor Control Board's policy, the employee is required to write the reason for the post-void transaction on a print-out produced by the cash register. This paperwork must be retained. Leonard testified that 51 of Employee's post-void transactions were missing some or all of the supporting paperwork.

Leonard then challenged "29" of Employee's post-void transactions for which paperwork was present but not corroborated. In these "29" post-void transactions, Employee wrote that the customer's credit card was declined. However, the cash register's electronic journal did not show that a credit card transaction had been attempted on those occasions. The Civil Service Commission's adjudication listed the "29" transactions as follows:

20. The BLCBS Auditors found that although the following void reports were notated as based upon a declined credit card, the corresponding electronic journal record did not indicate that a credit card transaction was either attempted or declined:

| | DATE/TIME OF VOID | | TRANSACTION NUMBER | AMOUNT |
|---|---|---|---|---|
| a. | 4/27 | 16:10 | 3433 | $48.74 |
| b. | 5/19 | 09:56 | 5217 | $20.22 |
| c. | 5/24 | 18:03 | 5716 | $24.58 |
| d. | 6/08 | 18:49 | 7236 | $11.12 |
| e. | 6/30 | 09:50 | 9145 | $27.54 |
| f. | 7/06 | 17:39 | 9849 | $21.19 |
| g. | 7/09 | 10:35 | 0131 | $16.94 |
| h. | 8/06 | 17:23 | 2612 | $27.55 |
| i. | 8/07 | 12:25 | 2720 | $14.83 |
| j. | 8/13 | 12:13 | 3133 | $ 9.53 |
| k. | 9/04 | 09:45 | 5340 | $16.95 |
| l. | 9/04 | 11:57 | 5372 | $36.01 |
| m. | 9/10 | 09:27 | 5814 | $12.29 |
| n. | 9/14 | 18:18 | 6218 | $16.95 |
| o. | 9/17 | 20:56 | 6494 | $ 9.53 |
| p. | 9/22 | 09:40 | 6737 | $21.19 |
| q. | 9/23 | 16:57 | 6896 | $22.24 |
| r. | 9/29 | 17:51 | 7551 | $40.26 |
| s. | 10/04 | 14:27 | 7953 | $14.83 |
| t. | 10/06 | 15:06 | 8225 | $21.18 |
| u. | 10/07 | 19:41 | 8422 | $77.34 |
| v. | 10/12 | 18:38 | 8834 | $22.25 |
| w. | 10/15 | 20:44 | 9136 | $14.83 |
| x. | 10/21 | 18:35 | 9584 | $61.45 |
| y. | 10/27 | 15:54 | 0196 | $25.43 |
| z. | 10/29 | 19:54 | 0493 | $15.89 |
| aa. | 10/30 | 10:45 | 0536 | $29.67 |
| bb. | 11/06 | 20:54 | 1325 | $11.65 |
| cc. | 12/18 | 20:07 | 5789 | $13.77 |

2. Because of this potential for theft, only the manager or the assistant manager can authorize the post-void function on the cash register. When they do this, the employee responsible for the post-void is identified by his password.

| dd. | 12/30 | 20:20 | 7688 | $21.19 |
| --- | --- | --- | --- | --- |

Commission Adjudication, Finding of Fact No. 20. All took place in 2010. Notably, the list contains 30, not 29 transactions. Nevertheless, the Civil Service Commission referred to this list as having "29" transactions throughout its adjudication, as did Leonard in her testimony.

Leonard explained other cash register functions. The "no sale" function allows the employee to open a drawer without registering a sale and is done when an employee needs to make change. The "pick-up" function is done when cash is removed from the cash register and moved to a safe. Policy requires that cash in the register not exceed $250.

Leonard explained that it is suspicious when a "no sale" or a "pick-up" function is recorded soon after a post-void transaction.[3] This is because it suggests that the employee used the function to extract the cash placed in the register from the transaction that had been voided fraudulently. Leonard stated that she discovered a number of instances where Employee did a no sale or pick-up function shortly after a post-void transaction, i.e., within five transactions. Although the pick-up function should be done when cash exceeds $250, Employee used the pick-up function at least once when the drawer held less than $200. Leonard acknowledged that the timing of these transactions could be innocent and, in any case, did not prove fraud. Commission Adjudication at 20.

Finally, Leonard testified that 91 of Employee's 102 post-void transactions correlated to missing inventory. She did not explain how the Liquor Control Board's inventory review could "correlate" a loss to a post-void transaction as opposed to an incident of customer shoplifting. In any case, Leonard explained that the Liquor Control Board found this correlation not to demonstrate fraud but, rather, to be "questionable."

Leonard was questioned about whether she had a conflict of interest because her father managed a liquor store in the same district as Store 0608. Her father's supervisors were the same as Mull's. Leonard explained her father had not been a target of the investigation; did not have a personal relationship with his supervisors; and did not have a personal relationship with Mull.

Jerome Yeager, the district manager, next testified. He stated that he does a cursory monthly review of the store paperwork, but he does not have access to the electronic journal. After Employee reported Mull's misconduct, he noticed that some paperwork was missing. Because Mull could not explain this problem, an investigation of Mull was begun. Yeager stated that he knew nothing about the origins of the investigation of Employee and did not learn of it until the regional manager informed him that Employee was being suspended. Yeager acknowledged that he had been a personal friend of Mull, who had given him the nickname "Uncle Jerry." R.R. 266a. He also supervised Leonard's father and Mull's mother, who were each managers of other state stores in Yeager's district.

Andrea Smallacombe, a human resource analyst with the Liquor Control Board,

---

**3.** The Liquor Control Board identified "18" "no sale" transactions and "12" "pick-up" transactions with this "proximity." R.R. 792a. In actuality, there were 17 no sales and 13 pickups. Commission Adjudication, Finding of Fact Nos. 23, 24. The "no-sales" related to 102 post-voids and covered a period from 2009 to 2011; the pick-ups related to transactions in 2010.

was the final witness. Her office reviewed the evidence uncovered in the investigation of Employee and held a fact finding meeting with her. Smallacombe concluded that Employee had violated policy by voiding sales without consistently recording the reason and without attaching the original sales receipts to the voided receipts. Some of this required paperwork was missing. Likewise, Employee had not written down an accurate reason for post-void transactions. Smallacombe believed that there was some correlation between Employee's post-void transactions and missing inventory but was not specific.

In response, Employee presented the testimony of Charles Mooney, a regional manager. In that capacity, he reviews the annual performance evaluation of store managers in his region, including that of Mull, Mull's mother, and Leonard's father and Yeager. He acknowledged these personnel and personal relationships but did not believe it presented a conflict of interest.

Harold Leiby, a liquor store examiner in the Office of Auditor General, testified that Employee reported her belief to him that Mull was engaged in fraud. She explained that she had shared this information with Yeager but had heard no response. Leiby mentioned the matter to his supervisor, and shortly thereafter, in January 2011, the Auditor General began to investigate Mull.

In this investigation, Leiby studied inventory. The Liquor Control Board treats a loss factor of .0005 as acceptable. Store 0608 had a loss factor of .0029, which Leiby described as "bad." R.R. 581a. He also discovered that significant paperwork from Store 0608 was missing. Yeager explained that the Liquor Control Board had removed a box of records from Store 0608,

presumably in connection with the criminal investigation of Mull.[4] Leiby's investigation of Mull was completed in June 2011 and in no way involved Employee. Likewise, he did not look at electronic journals for either Employee or Mull.

Employee testified that she had never been disciplined in her work for the Liquor Control Board and had received good performance evaluations. She was shocked to learn of her suspension. She believed her reporting of Mull had caused her suspension and dismissal. In support, she explained that Yeager did nothing about her complaint about Mull until after she talked to Leiby.

Employee responded to the irregularities identified by Leonard. She stated that she complied with all the Liquor Control Board's requirements for post-void transactions; she always printed a receipt and wrote down a reason for the voided sale. Her paperwork was then given to the manager, Mull. She had no control over the paperwork.

She also addressed Leonard's statement that the electronic records did not always confirm her written notation on a post-void transaction that a card had been declined. Employee explained that a credit card is often declined before it is swiped, so there would be no electronic record. This would happen if a credit card were not signed; if the customer could not provide identification; or the name on the card did not match the person, *i.e.*, a female name on a credit card presented by a male. It would also happen if a customer attempted to use an unacceptable card, such as a Pennsylvania Department of Public Welfare Access Card issued for the purchase of food. After being promoted to Clerk 2, Employee learned that the "store would get a charge

4. Leonard testified that in April 2011, criminal allegations were made against Mull by the Board and a box of store reports were turned over to the police.

back" where a fraudulent credit card was accepted, and this made her more diligent in asking for identification and checking signatures on credit cards. R.R. 603a.

With respect to the pick-up function on the cash register, Employee testified that when the light on the cash register appears, the money is placed in a bag and either taken to a bank located next to the store or placed in the office safe. She could not explain why there would be a pick-up when there was less than $250 in the register. In any case, she stated that her pick-ups were no different in number or timing than those of any other employee. Like others, she routinely used the no sale function to make change. The Liquor Control Board did not have a policy limiting the use of a pick-up or no sale function after a post-void transaction.

Employee testified that she completed approximately 200 cash register transactions a day, which equaled 4,000 transactions a month and 72,000 transactions over the course of the 18–month investigation period. During her years of employment, the detail and quality of her written reasons on post-void transactions were never questioned or criticized. Her performance reviews were good. Long after the fact, the Liquor Control Board questioned 102 transactions out of 72,000, most of which involved missing paperwork. She had no control over the paperwork on the post-voids because she had given the paperwork to Mull, her supervisor. All the missing paperwork related to the time period when Mull was in charge. The electronic journal did not prove that her paperwork was not accurate on the 30 post-voids she had attributed to credit card problems because a credit card can be refused before it is swiped.

The Civil Service Commission concluded that the Liquor Control Board had just cause to dismiss Employee. However, it rejected some of the Board's justifications for dismissal.

The Commission rejected the claim that Employee had failed to complete the required paperwork on 51 post-void transactions. It reasoned that once Employee completed the paperwork, it was out of her control. It may have been that Mull destroyed it. In any case, because of the fact that several different persons and agencies were investigating Store 0608, it was impossible to fault Employee for paperwork missing from 51 of the post-void transactions.

On the other hand, the Commission found that Employee's "29" (actually 30) post-void transactions violated the Liquor Control Board's policy. Specifically, the Commission held that because the electronic journal did not show a credit card swipe was attempted on these 30 post-void transactions, Employee's statement that credit had been declined were "unexplained discrepancies." Commission Adjudication at 37. The Commission found that this lack of electronic corroboration showed that Employee had violated the Liquor Control Board's policy by not writing down the real reason for the post-void transaction.

Finally, the Civil Service Commission rejected Employee's claim that her dismissal was done in retaliation for reporting Mull's fraudulent conduct. The Commission held that because evidence supported a violation of the Board's policy regarding post-void transactions, it did not matter why the investigation was undertaken.

Employee then petitioned for our review. In her appeal, Employee raises four claims of error.[5] First, she contends the

5. Our review is limited to determining wheth- er the Commission's findings are supported

investigation against her was tainted by conflicts of interest. Second, she contends her suspension violated her due process rights. Third, she argues that the Civil Service Commission erred in finding just cause existed for her removal. Fourth, she claims the Civil Service Commission erred in declining to modify or set aside the discipline imposed.

■■■ Section 807 of the Civil Service Act [6] provides "[n]o regular employe in the classified service shall be removed except for just cause." 71 P.S. § 741.807. The Act does not define "just cause." The Court has explained that "just cause for removal is largely a matter of discretion on the part of the head of the department." *Perry v. State Civil Service Commission (Department of Labor and Industry),* 38 A.3d 942, 951 (Pa.Cmwlth.2011). However, "just cause 'must be merit-related and the criteria must touch upon [the employee's] competency and ability in some rational and logical manner.'" *Wei v. State Civil Service Commission (Department of Health),* 961 A.2d 254, 259 (Pa.Cmwlth. 2008) (quoting *Galant v. Department of Environmental Resources,* 534 Pa. 17, 20 n. 2, 626 A.2d 496, 498 n. 2 (1993)). Further, to be sufficient, it "should be personal to the employee" and render him unfit for his job, "making dismissal justifiable and for the good of the service." *Perry,* 38 A.3d at 951. The Civil Service Commission is the finder of fact and has exclusive authority to assess credibility and to determine evidentiary conflicts. *Wei,* 961 A.2d at 259. "Whether the actions of a civil service employee constitute just cause for removal is a question of law fully reviewable by this Court." *Perry,* 38 A.3d at 951.

In her first issue, Employee argues that the Board's investigation and suspension were done in retaliation for her reporting Mull's fraud. In support, she notes the friendship between Mull and Yeager; the supervision of Mull's mother and Leonard's father by Yeager; and the supervision of everyone by Mooney. Employee claims that the investigation was hurried and incomplete and that Smallacombe did not consider Leiby's investigation of Mull and how Mull's misconduct could explain the missing paperwork and inventory. The Liquor Control Board responds that Mull's misconduct warranted an examination of records at Store 0608 and, simply, there was no conspiracy.

The Civil Service Commission observed that the accuracy of the electronic records was not challenged, and Employee did not claim that she did not do the 30 post-void transactions in question. The "web" of personal relationships between Mull, Yeager, Leonard and Mooney was irrelevant. Even assuming Employee was targeted inappropriately, the evidence was clear that she was responsible for the 30 post-void transactions at issue.

We agree with the Commission. It is not disputed that the 30 post-void transactions at issue were Employee's. Smallacombe did not address Mull's misconduct, but it is irrelevant. Further, Leiby's audit did not include an examination of the electronic record regarding post-void transactions. The only relevant issue was whether Employee had complied with the Liquor Control Board's policies.

In her second issue, Employee asserts that her suspension without pay violated due process. The Liquor Control Board

by substantial evidence, whether the Commission erred as a matter of law or whether it violated constitutional rights. *Cutler v. State Civil Service Commission (Office of Adminis-*

*tration),* 924 A.2d 706, 709 n. 3 (Pa.Cmwlth. 2007).

**6.** Act of August 5, 1941, P.L. 752, *as amended,* 71 P.S. §§ 741.1–741.1005.

responds that it could not speak to Employee before it suspended her because the auditors had not yet completed their investigation. Once the investigation was done, Employee was provided an opportunity to participate in a fact-finding session.

On September 21, 2011, the Liquor Control Board notified Employee, in writing, that she was being suspended without pay pending the completion of an investigation of her "fraudulent/questionable" post-voids. R.R. 749a. She was advised that a fact finding meeting would be scheduled at a later date. On October 31, 2011, Employee was notified that the fact-finding meeting was scheduled for November 15, 2011, at which she appeared. On December 6, 2011, she was dismissed effective December 13, 2011.

Employee concedes that an employee in the classified service may be suspended without pay pending an investigation.[7]

However, Employee claims that under *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), she was entitled to a pre-suspension hearing as a matter of due process because a government employee has a property interest in his continued employment. Further, in *City of Philadelphia v. Fraternal Order of Police, Lodge No. 5,* 140 Pa.Cmwlth. 235, 592 A.2d 779, 784 (1991), this Court held that the requirements of *Loudermill* apply to suspensions, not just terminations of employment.

In *City of Philadelphia,* a police officer was suspended without pay after he was criminally charged for an off-duty assault. He argued that due process required notice and an opportunity to respond before his suspension. In reviewing this claim, we applied the three-factor test established in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

---

**7.** Section 803 of the State Civil Service Act provides:

> An appointing authority may for good cause suspend without pay for disciplinary purposes an employe holding a position in the classified service. Suspensions, including suspensions pending internal investigation, shall not exceed sixty working days in one calendar year; however, suspensions pending investigation by external agencies may be maintained up to thirty working days after conclusion of the external investigation. No person shall be suspended because of race, gender, religion or political, partisan or labor union affiliation. What shall constitute good cause for suspension may be stated in the rules. An appointing authority shall forthwith report to the director in writing every suspension, together with the reason or reasons therefor, and shall send a copy of such report to the suspended employe. Such report shall be made a part of the commission's public records.

71 P.S. § 741.803. Title 4 of the Pennsylvania Code provides the following guidelines when suspending civil service employees:

> (b) Suspension pending investigation may be instituted for the purpose of ascertaining an employee's fitness for continued employment.
>
> (1) When the investigation has not revealed cause for disciplinary action, the suspension shall be retracted and expunged from all records, with the employee receiving back pay for the full period of suspension.
>
> (2) When the investigation has revealed cause for disciplinary action, the suspension shall be converted, either in whole or in part, to a disciplinary action.
>
> (c) Suspensions, to include suspensions pending internal investigation, may not exceed an aggregate of more than 60 work days in a calendar year.
>
> (d) An employee suspended, pending investigation by an external agency, may be suspended for the duration of the external investigation and up to 30 consecutive work days after the conclusion of the external investigation.
>
> (e) The Commission may impose a suspension of not more than 120 work days under section 905.2 of the act (71 P.S. § 741.905b).

4 Pa.Code § 101.21(b)–(e).

This requires a private interest affected by the government's action; an erroneous deprivation of the private interest; and a consideration of the state interest to be served by an immediate suspension.

We held that the police officer had a protected interest in his employment. On the second factor, we explained that the deprivation was temporary to allow an investigation that would "lessen the chance that there will be an erroneous deprivation and provides a basis to establish just cause for the suspension." *City of Philadelphia*, 592 A.2d at 784. Further, if an erroneous deprivation did occur, "the police officer would be entitled to back pay for the duration of the improper suspension." *Id.* On the third factor, we held that the government had a substantial interest in retaining public trust, which warranted the removal of a police officer charged with criminal misconduct. We concluded that due process did not require a pre-suspension evidentiary hearing.

■ *City of Philadelphia* is compelling precedent insofar as it establishes Employee's protected interest in her government employment. However, the case is distinguishable. In *City of Philadelphia*, the potential for an erroneous suspension was diminished by the fact that a law enforcement agency had done an investigation sufficient to support the filing of criminal charges against the officer. Here, the investigation was inchoate and based upon policy violations, not criminal misconduct. Further, there was not the same public trust concern that is presented by the public learning that an officer of the law has been charged with a crime. On the other hand, the Liquor Control Board has an interest in preventing fraud, and this may warrant a suspension while it completes its investigation. However, we need not decide whether Employee was entitled to some kind of pre-suspension process

because we conclude that the factual findings of the Civil Service Commission were inadequate.

This takes us to Employee's third issue. She contends that the record does not support the conclusion that the Liquor Control Board had just cause to dismiss her. First, she observes that there is no official policy forbidding an employee from doing a no sale or cash pick-up function within five transactions of a post-void transaction. Second, she contends that the evidence did not establish that the 30 post-void transactions were improper.

This argument misses the mark. Leonard stated that the timing of the "29" post-void transactions appeared suspicious, but Employee was not charged with violating Board policy by doing a no sale or cash pick-up function within five transactions of a post-void. Further, the Civil Service Commission did not hold that such conduct violated Board policy, noting that even Leonard acknowledged that the timing of the transactions could be a matter of coincidence, not design.

Employee was found to have violated the Liquor Control Board's policy in the 30 post-void transactions where she wrote that credit cards had been declined. The Civil Service Commission found her reports were inaccurate because the electronic journal did not corroborate them. Further, Employee did not present evidence to challenge the accuracy of the electronic journal. However, Employee explained that a swipe will not always take place where a credit card is rejected. For example, it could be rejected because the credit card lacked a signature or because the customer presented something other than a valid credit card for payment, such as an Access card. The Liquor Control Board did not contradict this explanation. Nevertheless, the Civil Service Commission was silent on Employee's explanation.

The Liquor Control Board's policy on "post-voids" states as follows:

> Immediately respond to a store employee who reports ringing a sale in error on the register. Verify the error, and, if necessary, void the transaction. *Record the reason for the void* and the correcting ring's sequence transaction number (if applicable) on the register receipt. If the transaction was a Post Void, the original sales receipt must also be attached to the Post Void receipt. The voided register receipt must be attached to the Clerk Settlement Report.

R.R. 815a (emphasis added). The Commission found that Employee's recorded reasons were not accurate and, thus, she violated this policy.

■ Employee's written reasons for the 30 credit card post-voids included: "card not approved;" "card declined;" "card not accepted;" "credit declined;" "not approved," "credit card not signed;" "not enough on card;" "tried to use 'Access card';" and "credit would not authorize." R.R. 757a–789a. Employee did not write "bank declined." Further, Employee's above-listed written reasons do not necessarily mean that a swipe was made that triggered an electronic recording. The cashier could decline the card before the swipe for the reasons explained by Employee in her testimony. The Civil Service Commission did not consider Employee's explanation or even acknowledge that her written reasons were stated differently. Instead, it treated all 30 reasons as claiming that the credit sale was rejected by the customer's bank. This was error because Employee's written reasons do not so state. Further, the Commission did not explain why, or how, there could be an electronic corroboration of a cashier's refusal to accept an Access card or to swipe a credit card because, for example, it was not signed. Notably, the accuracy of the electronic journal should have been established by the Liquor Control Board; it was not Employee's job to prove it defective.

The Liquor Control Board asserted that 91 of Employee's 102 post-voids correlated to missing inventory, and Smallacombe testified that missing inventory was a factor in her discharge. The Commission alluded to the alleged inventory correlation, but it made no factual findings on that point. It based its just cause determination solely on the 30 transactions. Further, the Liquor Control Board itself treated the missing "correlation" as raising a question, but not proving fraud.

Employee challenged the Liquor Control Board's evidence. She contends that the Liquor Control Board's evidence does not support any correlation between missing inventory in the store and any of her post-void transactions. First, the inventory does not track a discrete alcoholic beverage item but only a type. The data are too general to connect any employee's post-void sales to a particular missing item. Second, there is a gap of many months between the occurrence of the post-void transactions and the discovery of missing inventory. At that point it is impossible to "correlate" missing inventory to any particular post-void transaction. All employees may have had occasion in the same month to void a sale involving, for example, Canadian Club. Should units of Canadian Club be discovered missing several months later, it could not be known whether the missing units were shoplifted by a customer from the shelf, taken by the night shift cleaning crew from storage or taken by an employee who entered a fraudulent post-void transaction. It cannot be known when or how the inventory was lost.

Employee contends that, simply, the data presented by the Liquor Control Board do not show a correlation. Its evi-

dence established only that the store suffered an inventory loss of $13,037.28 during the period of time that Mull was store manager, an individual who had registered five times the number of post-voids that Employee did. The data did not establish how or when or by what individual the inventory was lost.

 The factual findings of the Civil Service Commission are inadequate. The Commission needs to make specific factual findings about whether each of Employee's written reasons for the 30 post-void transactions needed electronic corroboration. It must also make specific findings of fact about whether the documentary evidence presented by the Liquor Control Board supports an inference that missing inventory at Store 0608 can be correlated to a particular employee's post-void transaction, to random shoplifting or to other forms of theft.

For these reasons, we vacate the adjudication of the Civil Service Commission and remand for more fact finding.[8]

### ORDER

AND NOW, this 13th day of August, 2013, the order of the State Civil Service Commission (Commission), dated December 18, 2012, is hereby VACATED and the matter is REMANDED to the Commission to make findings of fact and credibility in regard to the post-void transactions deemed to have violated the policy of the Pennsylvania Liquor Control Board, in accordance with the attached opinion.

Jurisdiction relinquished.

---

**8.** Because we remand, we need not address Employee's fourth claim, *i.e.*, that the Commission erred in declining to modify or set aside the imposed discipline.