THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| SHAYNA M. HARRIS, | ) | No. 81021-9-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| RONALD A. SMITH, JR. | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

ANDRUS, A.C.J. — Ronald Smith appeals the trial court's order granting his former partner's petition for a domestic violence protection order (DVPO), protecting herself and their teenage daughter. Smith challenges the DVPO on the basis that the trial court considered inadmissible evidence, the order violates federal and state child dependency statutes, and that he was denied procedural due process. We disagree and affirm the order.

<u>FACTS</u>

Shayna Harris filed a petition for a DVPO on November 18, 2019, seeking to restrain her former partner, Ronald Smith, from having contact with her and their teenage daughter, H.E. In the petition, Harris alleged that H.E., who was living with Smith at the time, went missing on November 15, 2019 and Smith refused to

call the police due to his criminal activities. Harris alleges that, when H.E. returned home, she exhibited symptoms of sexual assault, such as isolating herself, withdrawing, and not paying attention to her personal hygiene, and told Harris she was scared to speak to anyone about her father. Harris further alleged that Smith had repeatedly assaulted her, threatened her with bodily harm, trashed her house, and prevented her from seeing H.E. Harris recounted one instance where Smith refused to let Harris see H.E. unless Harris engaged in acts of prostitution for Smith's financial benefit. In another instance, when H.E. came to Harris's house in January 2019, Smith threatened to beat Harris and have her evicted if Harris did not return H.E. to Smith. Harris and Smith do not have a parenting plan governing custody of H.E.

On December 2, 2019, Smith submitted a declaration in response to Harris's petition, alleging that he was H.E.'s sole care provider for seven years and that Harris had repeatedly abandoned H.E. so that she could "run the streets. . . . with different men." Smith denied Harris's accusations of neglect or abuse of H.E.

On December 16, 2019, the court ordered the Department of Children, Youth, and Family (DCYF) or Child Protective Services (CPS) to provide the court with information regarding any investigation into H.E. or her parents. It ordered Family Court Services (FCS) to provide a report to the court regarding any DCYF or CPS investigation. FCS provided the court with a summary of its contact with CPS in a December 31, 2019 status report. In this report, FCS informed the court that CPS had an open "Family Assessment Response" (FAR) investigation based on Harris's allegation that H.E. suffered from a skin condition that Smith was not

adequately treating and H.E. fled her father's home because the home was unsafe. The CPS investigator reported to FCS that H.E. expressed she felt safe at both parents' homes and denied Smith touched her inappropriately. H.E. did report, however, that Smith had in the past hit her with a belt and a clothes hanger. CPS indicated it had insufficient information to indicate that there were safety risks or concerns with either parent at that time.

At the January 3, 2020 hearing on Harris's petition, Harris described several incidents where Smith was violent and abusive to her in the presence of H.E. During one incident in 2007, when Harris attempted to prevent Smith from taking H.E., Smith kicked down the door to Harris's house before smashing her head through the side mirror of a neighbor's car. Harris reported the incident to the police, but the charges were ultimately dismissed. Harris later received section 8 housing, but when she informed Smith that he could not live there with her and H.E., he destroyed the apartment and Harris was evicted. In 2014, Smith, without informing Harris, transferred H.E. to a different elementary school and prevented Harris from contacting H.E. for a year. Harris also testified that H.E. had told her that Smith had slapped and choked H.E. and had witnessed prostitution in the house. Harris testified that H.E. has been diagnosed with post-traumatic stress disorder as a result of living with Smith.[1]

Smith, appearing pro se, also testified at the hearing and generally denied all allegations of abuse and neglect. Smith admitted that he had been previously arrested for domestic violence for incidents occurring in the presence of his

---

[1] It appears that Harris also submitted a supplemental declaration in which she supplied additional mental health records and police reports. Those materials are similarly not in the record before us.

children. It also appears that Smith submitted under seal a psychiatric evaluation of Harris dating from June 2003, a CPS summary report of a referral from July 2002, and a police report from the Kent Police Department from September 2019 in which the police indicated Harris had called police to report that she was the victim of an assault by her then boyfriend, Darnell or Donald Wallace, and was being forced to prostitute for him.

Smith also called his sister, Sheila, to testify at the protection order hearing. She stated she had never witnessed any domestic violence between Smith and Harris and that H.E. reported that she was afraid of a man Harris was involved with.

In making its oral ruling, the court indicated it had considered all of this testimony as well as the December 31, 2019 FCS status report, the "JABS" history with respect to both Harris and Smith,[2] H.E.'s declaration, and police reports from the Kent and Des Moines Police Departments.

Based on this evidence, the trial court found by a preponderance of the evidence that Smith had committed domestic violence against both Harris and H.E. and entered a protection order restraining Smith from contacting either individual for a period of one year. The order provides that H.E. may initiate contact with Smith via telephone or email and allows Smith two hours of supervised in-person contact with H.E. per month. The order also includes an order to surrender

---

[2] "JABS" refers to the Judicial Access Browser System which provides judicial officers access to data stored in the Judicial Information System (JIS) database. WASHINGTON JUDICIAL ETHICS OPINION 13-07, 2013 WL 5780438. JABS uses a web browser to display case history information on certain kinds of cases filed in superior, district and municipal courts in Washington. Id. The JIS database serves as a statewide clearinghouse for criminal history information, domestic violence protection orders and outstanding warrants. http://www.courts.wa.gov/jis/

weapons and a requirement that Smith participate in domestic violence perpetrator treatment.

ANALYSIS

Smith challenges the trial court's findings and the terms of the protection order. We review a superior court's decision to grant a protection order for abuse of discretion, In re Marriage of Stewart, 133 Wn. App. 545, 550, 137 P.3d 25 (2006).

Smith first argues that the trial court considered inadmissible evidence in the form of H.E.'s declaration and police reports from Smith's prior domestic violence cases. Although neither H.E.'s declaration nor the police reports are in the appellate record, we can identify no abuse of discretion in the trial court's evidentiary rulings.

First, the rules of evidence do not apply to protection order proceedings initiated under chapter 26.50 RCW. ER 1101(c)(4); Gourley v. Gourley, 158 Wn.2d 460, 467, 145 P.3d 1185 (2006). Failing to follow the rules of evidence cannot be an abuse of discretion if those rules are inapplicable to the proceeding.

Second, Smith fails to articulate why considering H.E.'s declaration was an abuse of discretion. He claims that the court did not adhere to the "formal requirements for a valid court declaration pertaining to a minor," but does not identify what these requirements are, nor explain how H.E.'s declaration failed to meet them. He also argues that H.E. "may not have written that declaration in the first place," but offered no evidence to support this allegation.

Smith similarly fails to demonstrate how the admission of the police reports concerning his past domestic violence arrests violates ER 103 and 104.[3] He only argues that the charges in those cases are over ten years old and were ultimately dismissed. But this argument attacks the weight of the evidence, not its admissibility.

Finally, neither H.E.'s declaration nor the police reports are in the record on review. The party seeking review has the burden of perfecting the record so that the reviewing court has before it all of the relevant evidence. State v. Vazquez, 66 Wn. App. 573, 583, 832 P.2d 883 (1992). An insufficient record on appeal precludes review of the alleged errors. Allemeier v. University of Wash., 42 Wn. App. 465, 472–73, 712 P.2d 306 (1985), review denied, 105 Wn.2d 1014 (1986). Smith has failed to provide this court with an adequate record to review his arguments relating to H.E.'s declaration and the police reports and we decline to review this assignment of error.

Smith next argues that the court's order violated provisions of the Juvenile Court Act, chapter 13.34 RCW. But the Juvenile Court Act governs cases related to the dependency of a child and the termination of the parent-child relationship; it is inapplicable to the question of whether the trial court properly granted a domestic violence protection order under chapter 26.50 RCW. His citation to 42 U.S.C. § 671(a)(15)(B)'s requirement that state foster care plans include reasonable efforts to preserve families to be eligible for federal funding is also inapposite to the present issue.

---

[3] Smith does not argue that the police reports violate ER 404(b)'s prohibition of evidence of past crimes to show action in conformity therewith.

Smith lastly argues that the court's order denied him his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution. We reject this argument as well.

We review Smith's constitutional challenge de novo. Shoop v. Kittitas County, 149 Wn.2d 29, 33, 65 P.3d 1194 (2003); Aiken v. Aiken, 187 Wn.2d 491, 501, 387 P.3d 680 (2017). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965)). The level of procedural protection required varies based on circumstance. Id. at 334.

Smith asserts that he was denied due process because the court did not allow him to directly cross examine Harris. But chapter 26.50 RCW "does not require a trial judge to allow live testimony or cross-examination in every protective order proceeding. Instead, whether live testimony or cross-examination is required will turn on the Mathews balancing test." Aiken, 187 Wn.2d at 499.

> In evaluating the process due in a particular situation, [Washington courts] consider (1) the private interest impacted by the government action, (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) the government interest, including the additional burden that added procedural safeguards would entail.

Aiken, 187 Wn.2d at 501-02 (quoting Mathews, 424 U.S. at 335). Our Supreme Court has repeatedly held that a parent's interest in making decisions regarding the care, custody, and control of their children does not outweigh the government's

compelling interest in preventing domestic violence. Id. at 502-03; Gourley, 158 Wn.2d at 468. Turning to the second Mathews factor, we conclude that the procedural safeguards employed by the court were sufficient.

First, although the court did not allow Smith to confront Harris directly, it did allow Smith to cross examine her by identifying on the record each question he wanted to ask with the court rephrasing them in an appropriate manner. For instance, Harris testified that Smith had in the past exerted control over her finances, trashed her home, and caused her to be evicted from transitional or section 8 housing. During cross examination, Smith asked: "Did Shayna Harris call [the] police any other times when she is saying that I trashed her house, controlled her money -- I mean did she call the police during those times?" After laying foundation for the question, the court asked Harris: "And if I understand correctly, either in the context of the YWCA, that transitional housing, or the section 8 – the incident at the section 8 -- were the police ever called about those?" Harris admitted she did not call the police about those incidents.

Smith contends that this procedure violated his due process rights because the court did not ask "the particular questions [he] had for Shayna Harris." But the record does not support this contention. The court did ask Harris the questions Smith posed, both during cross examination, and when Smith called Harris to the stand as his own witness. Other than questions Harris objected to as irrelevant, there was only one question the court declined to ask Harris. In relation to Harris's allegations that Smith "pimped prostitutes," Smith asked "is Shayna herself actually a prostitute?" The court refused to pose this question to Harris, stating that the

- 8 -

question "would absolutely trigger her right against self-incrimination and she has already testified in terms of what her -- what her recollection was of what happened back in 2004, so I am not -- and I apologize but I am not going to ask that." Nothing in the record supports Smith's argument that his ability to cross examine Harris was so hampered as to deny him due process.

Washington courts have repeatedly recognized the Domestic Violence Prevention Act (DVPA) offers respondents in a DVPO proceeding sufficient procedural protections. Aiken, 187 Wn.2d at 502; Gourley, 158 Wn.2d at 468-69. The provisions of the DVPA

> satisfy the two fundamental requirements of due process—notice and a meaningful opportunity to be heard by a neutral decision maker. The procedural safeguards include: (1) a petition to the court setting forth facts under oath, (2) notice to the respondent, (3) a hearing before a judicial officer where the petitioner and respondent may testify, (4) the opportunity to file a motion to modify a protection order, (5) a requirement that a judicial officer issue any order; and (6) the right to appeal.

State v. Karas, 108 Wn. App. 692, 699-700, 32 P.3d 1016 (2001) (citing Spence v. Kaminski, 103 Wn. App. 325, 334, 12 P.3d 1030 (2000). Smith enjoyed the protection of each of these procedural safeguards in the present case.

Smith was timely served with Harris's petition and had reasonable notice and opportunity to be heard. He submitted his own declaration in response, appeared and testified at the hearing, and called his own witnesses to support his case. Moreover, the risk of the erroneous deprivation of Smith's constitutional interests is mitigated by the DVPO's limited one-year term. See Mathews, 424 U.S. at 341 (holding that the possible length of wrongful deprivation of a property

interest is an important factor in assessing the impact of official action on the private interests).

Smith has failed to show how these numerous safeguards were so deficient as to deprive him of due process. Our Supreme Court has repeatedly upheld these procedural protections in the DVPO context and we adhere to those holdings here.

We affirm the trial court's order grating the petition for a DVPO.

_Andrus, A.C.J._

WE CONCUR:

_Chun, J._                    _Verellen, J._