IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

TRACY D., TARAH D., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, T.D., *Appellees*.

No. 1 CA-JV 20-0204
FILED 12-30-2021

---

Appeal from the Superior Court in Maricopa County
Nos. JD 20340
JS 20198
The Honorable Jo Lynn Gentry, Judge

**AFFIRMED**

---

COUNSEL

The Stavris Law Firm PLLC, Scottsdale
By Alison Stavris
*Counsel for Appellant, Tracy D.*

Denise L. Carroll Esq., Scottsdale
*Counsel for Appellant, Tarah D.*

Arizona Attorney General's Office, Tucson
By Autumn Spritzer
*Counsel for Appellee, Department of Child Safety*

---

**OPINION**

Judge Michael J. Brown delivered the opinion of the Court, in which Presiding Judge Jennifer M. Perkins and Judge David B. Gass joined.

---

**B R O W N**, Judge:

¶1          Tracy D. ("Father") and Tarah D. ("Mother") appeal the juvenile court's dependency and termination orders concerning their daughter, T.D.   Both parents challenge the court's subject matter jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), and Mother argues the court denied her due process when it conducted the consolidated adjudication hearing by telephone.   Neither parent challenges the merits of the dependency or termination orders.  Because the court had default jurisdiction under the UCCJEA, and Mother was not denied due process, we affirm.

**BACKGROUND**

¶2          In 2012, after a contested hearing, the juvenile court terminated Mother's parental rights to two older children (involving a different father) based on chronic substance abuse.  In March 2019, after receiving no contest pleas from each parent, the court terminated Mother and Father's parental rights to two other children, again due to chronic substance abuse.  Sometime in May that year, and near the end of her pregnancy with T.D., Mother traveled to Indiana, where her parents lived. Father remained in Arizona.

¶3          Mother gave birth to T.D. in early June 2019.  She returned to Arizona with T.D. about seven weeks after the child was born.  After receiving a report about T.D.'s welfare, the Department of Child Safety ("DCS") investigated and took the child into temporary custody.  DCS then petitioned for dependency on August 12, 2019, alleging the parents neglected T.D. because of their substance abuse and were unwilling or unable to provide effective parental care.  DCS also alleged Mother gave birth to T.D. in Indiana to avoid DCS involvement.

¶4          On September 18, 2019, DCS petitioned to terminate parental rights, alleging chronic substance abuse and prior termination due to the same cause as to both parents, and neglect as to Mother.  *See* A.R.S. § 8-

533(B)(2)–(3), (10). DCS noted both parents' long history of substance abuse and specifically alleged that Mother tested positive for methamphetamine during her pregnancy with T.D. as recently as the end of January 2019.

¶5            After scheduling delays, the court conducted a consolidated dependency/termination hearing on April 24 and 28, 2020. Because of health and safety concerns arising from the COVID-19 pandemic, the court conducted the hearing by telephone. The court later granted both petitions, finding T.D. dependent as to both parents, DCS proved all three statutory grounds for termination by clear and convincing evidence, and DCS met its burden of showing that termination of parental rights was in the child's best interests by preponderance of the evidence. Each parent timely appealed, and we have jurisdiction under A.R.S. § 8-235(A).

## DISCUSSION

### A.       Subject Matter Jurisdiction

#### 1.       Procedural History

¶6            In its termination ruling, the juvenile court found that T.D. had "been physically present within Arizona at all relevant times . . . [and] Arizona is the 'home state' of [T.D.] under the [UCCJEA]." On appeal, Father argued for the first time that the juvenile court lacked subject matter jurisdiction, contending T.D.'s home state was Indiana, not Arizona. Although the juvenile court had summarily concluded Arizona was T.D.'s home state, because the parties had not addressed the issue, we stayed the appeal and remanded to allow the juvenile court to conduct further proceedings to determine its jurisdiction under the UCCJEA.[1] *See Bruce v. State*, 126 Ariz. 271, 272 (1980) ("Jurisdiction cannot be waived and may be raised at any stage of the proceedings.").

¶7            On remand, the juvenile court held a UCCJEA conference with a circuit court judge from Jay County, Indiana, where Mother had given birth. Mother briefly testified, though no other parties were given the opportunity to cross-examine or to present additional evidence. The juvenile court then stated that it appeared "Indiana would be the home state" because Mother intended to reside there with T.D. after birth. When

---

[1]       Consistent with the child's best interests, this avoidable step shows the wisdom in having the parties and the juvenile court address jurisdictional issues at the outset of dependency and termination proceedings.

asked about Indiana's "inclination in terms of exercising jurisdiction," the Indiana judge explained he was unaware of any dissolution matter or Indiana Department of Child Services ("Indiana DCS") investigation involving T.D., but he would defer to the juvenile court's decision. The juvenile court then directed that a copy of T.D.'s file be provided to the Indiana judge and canceled a previously scheduled oral argument on jurisdiction.

¶8 The Indiana judge and an attorney with Indiana DCS participated in a follow-up status conference with the juvenile court. The attorney stated he did not think Indiana had jurisdiction, as Indiana DCS had not received a report about T.D. at birth, and thus Indiana lacked a sufficient connection to the child to "open a case." The Indiana judge said he would defer to the juvenile court's ruling, but noted he could not compel Indiana DCS to initiate proceedings for T.D. At the same hearing, T.D.'s guardian ad litem ("GAL") explained he had been unable to attend the prior UCCJEA conference and did not receive notice that the oral argument on jurisdiction had been vacated. In response, the juvenile court scheduled an evidentiary hearing to permit the parties to present evidence and to allow the court to make factual findings affecting jurisdiction.

¶9 Following the hearing, the juvenile court found that Arizona was T.D.'s home state at the time of the "commencement of the dependency and termination proceedings," and Mother and T.D.'s presence in Indiana for a period of weeks after the child was born was merely a temporary absence from Arizona. After considering Mother's testimony and other evidence, the court reasoned in part that, other than her own assertions, there was "no indicia of Mother's intent to remain in Indiana." After receiving the court's ruling, we permitted the parties to file supplemental briefing addressing the court's UCCJEA ruling.

## 2. Analysis

¶10 We review de novo whether the juvenile court has subject matter jurisdiction under the UCCJEA. *Gutierrez v. Fox*, 242 Ariz. 259, 264, ¶ 17 (App. 2017). But to the extent a court's jurisdictional decision depends on its resolution of disputed facts, we will accept the court's findings if they are supported by reasonable evidence. *Holly C. v. Tohono O'odham Nation*, 247 Ariz. 495, 505, ¶ 26 (App. 2019). We also review de novo the interpretation of statutes. *Nicaise v. Sundaram*, 245 Ariz. 566, 567, ¶ 6 (2019). "We interpret statutory language in view of the entire text, considering the context and related statutes on the same subject." *Id*. at 568, ¶ 11.

¶11 "The jurisdiction and authority of the courts of this state in all proceedings and matters affecting juveniles shall be as provided by the legislature . . . ." Ariz. Const. art. VI, § 15. As the legislature has mandated, jurisdiction over interstate child custody proceedings is governed by the UCCJEA. *See* A.R.S. §§ 25-1002(4)(A), 25-1031(A)(1); *Angel B. v. Vanessa J.*, 234 Ariz. 69, 73, ¶ 14 (App. 2014). Almost all states have adopted the UCCJEA, *Sha'quia G. v. Dep't of Child Safety*, 251 Ariz. 212, 214, ¶ 9 (App. 2021), including Arizona, A.R.S. §§ 25-1001 to -1067, and Indiana, Ind. Code. §§ 31-21-1-1 to -7-3.

¶12 Mother and Father first argue the juvenile court proceedings should have ended after the initial UCCJEA conference when the court concluded Indiana was likely the home state. Nothing in the record, however, shows the court intended that statement as a final ruling; in fact, the court decided to conduct a full evidentiary hearing after the GAL pointed out the procedural irregularities of the earlier UCCJEA hearing. The court acted within its discretion in conducting additional proceedings and then entering a definitive jurisdictional ruling. Thus, we turn to UCCJEA's statutory framework to decide whether the court had subject matter jurisdiction to hear the dependency and termination petitions.

¶13 Except for temporary emergency jurisdiction, under the UCCJEA, an Arizona court

> has jurisdiction to make an initial child custody determination only if any of the following is true:
>
> 1. This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state.
>
> 2. A court of another state does not have jurisdiction under paragraph 1 or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under § 25-1037 or 25-1038 and both of the following are true:
>
> (a) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence.

(b) Substantial evidence is available in this state concerning the child's care, protection, training and personal relationships.

3. All courts having jurisdiction under paragraph 1 or 2 have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under § 25-1037 or 25-1038.

4. A court of any other state would not have jurisdiction under the criteria specified in paragraph 1, 2 or 3.

A.R.S. § 25-1031(A). This UCCJEA subsection "is the exclusive jurisdictional basis for making a child custody determination by a court of this state." A.R.S. § 25-1031(B). We must therefore determine which of the statutory grounds for jurisdiction—home state, significant connection, more appropriate forum, or jurisdiction by default—apply to the circumstances presented here.

¶14 We first look to see if either Arizona or Indiana had home state jurisdiction under § 25-1031(A)(1). For a child less than six months old, the "[h]ome state" is "the state in which the *child lived from birth* with a parent or person acting as a parent, including any period during which that person is temporarily absent from that state." A.R.S. § 25-1002(7)(b) (emphasis added). Because T.D. was less than six months old when these proceedings began, we look to the circumstances existing when DCS filed its dependency and termination petitions to determine home state jurisdiction under § 25-1031(A)(1). *See* A.R.S. § 25-1002(5) ("'Commencement' means the filing of the first pleading in a proceeding."). DCS filed the petition for dependency on August 12, 2019, and the petition for termination of parental rights on September 18, 2019. *See* A.R.S. § 25-1002(4)(a) ("'Child custody proceeding' [m]eans a proceeding, including a proceeding for . . . neglect, abuse, dependency, guardianship, paternity, [or] termination of parental rights . . . in which legal custody, physical custody or visitation with respect to a child is an issue or in which that issue may appear."); *Sha'quia G.*, 251 Ariz. at 217, ¶ 20 (explaining the child custody proceeding referenced in § 25-1002(7)(a) "is the motion or petition then pending before the court").

¶15 Parents argue the juvenile court lacked subject matter jurisdiction because Indiana, and not Arizona, is T.D.'s "home state" under the UCCJEA. DCS defends the court's ruling on the grounds that Mother's

stay in Indiana constituted a temporary absence from Arizona under § 25-1002(7)(b).

¶16        When T.D. was in Indiana for approximately seven weeks after her birth, an Indiana court arguably could have exercised jurisdiction in making an initial custody determination if such a request had been made. But that issue is not before us. Instead, we initially determine, under the first clause of § 25-1031(A)(1), whether any state had home state jurisdiction when DCS *commenced* the dependency and termination proceedings. *See* A.R.S. § 25-1031(A)(1) (referencing the "home state of the child on the date of the commencement of the proceeding"); A.R.S. § 25-1002(7)(b) (when a child is less than six months old, the court will look to see whether, when the proceedings commenced, the child lived "from birth" in the state). On both of those dates, T.D. was living in Arizona, in the custody of DCS. Because she was no longer living "from birth" in Indiana, Indiana is not the home state under the first clause of § 25-1031(A)(1).

¶17        Likewise, Indiana is not the home state under the second clause. *See* A.R.S. § 25-1031(A)(1) (A "state has jurisdiction to make an initial custody determination" if it was "the home state of the child within six months before the commencement of the proceeding *and the child is absent from this state but a parent or person acting as a parent continues to live in this state*.") (Emphasis added.) The second clause necessarily includes children who are less than six months old. *See Gutierrez*, 242 Ariz. at 265, ¶ 21. In *Gutierrez*, the child was born in Arizona and lived here for two months. *Id*. at 266, ¶ 22. The mother then moved to Wisconsin with the child, and about two months later Father petitioned to establish custody-related matters in Arizona. *Id*. As *Gutierrez* explained, because the child was born in Arizona, and the father remained in Arizona after the mother's relocation with the child to Wisconsin, Arizona was the home state under the UCCJEA. *Id*. at ¶ 23.

¶18        In contrast, when DCS commenced the proceedings in this case, Mother was not "living" in Indiana, as confirmed by the juvenile court's finding that she had significant ties to Arizona and offered nothing except self-serving testimony to suggest she planned on returning to Indiana to live. *See Holly C.*, 247 Ariz. at 505, ¶ 26 (we defer to the court's findings of fact underlying a jurisdictional determination so long as they are supported by reasonable evidence). Thus, Indiana could not exercise home state jurisdiction under the second clause of § 25-1031(A)(1) because Mother did not live there, and Father still lived in Arizona. *See Gutierrez*, 242 Ariz. at 262, ¶ 2; *see also* Ind. Code § 31-21-5-1(a)(1) ("Indiana . . . was the home state of the child within six (6) months before the commencement

of the proceeding, and the child is absent from Indiana but a parent or person acting as a *parent continues to live in Indiana*.") (Emphasis added).

¶19 Contrary to DCS's contention, however, Arizona is not T.D.'s home state under § 25-1031(A)(1). T.D. did not live in Arizona "from birth" because she was born in Indiana. *See* A.R.S. § 25-1002(7)(b); *Meyeres v. Meyeres*, 196 P.3d 604, 607, ¶ 5 (Utah Ct. App. 2008) (["B]ecause the child was less than six months old when the proceedings were commenced, the only state that could be the child's home state was the state in which [the child] had lived with a parent since birth."); *In re D.T.*, 743 A.2d 1077, 1081 (Vt. 1999) (holding that Vermont was not 10-week-old child's home state because the child did not live in Vermont from birth).

¶20 Additionally, Arizona does not have home state jurisdiction under the theory that Mother's stay in Indiana was merely a temporary absence from Arizona. The temporary absence provision of § 25-1002(7)(b) comes into play only when a parent temporarily leaves the state where the child was born and then returns to that state, so the provision has no application here. *See* A.R.S. § 25-1002(7)(b) (defining "[h]ome state," for child less than six months old, as the state where "the child lived from birth with a parent," including any period when the parent is "temporarily absent from that state"); *In re Tieri*, 283 S.W.3d 889, 894 (Tex. App. 2008) (explaining that, under Texas's version of the UCCJEA, "[a]lthough a temporary absence of a parent is part of the period, there is no provision for the children's temporary absence from the state").

¶21 When there is no home state under § 25-1031(A)(1), the second ground for jurisdiction, a "significant connection," may allow a state to exercise jurisdiction. *See* A.R.S. § 25-1031(A)(2)(a). But neither Arizona nor Indiana had a "significant connection" with T.D. at the relevant time. As of the filing of the dependency petition, T.D. had lived in Arizona for less than two weeks, and when the termination petition was filed she had lived in Arizona for about seven weeks. Given those circumstances, T.D. had no "significant connection" to Arizona, or Indiana, other than her physical presence. *See id.* Moreover, we cannot conclude that "substantial evidence" exists in this record, as of the commencement of the proceedings, concerning T.D.'s "care, protection, training and personal relationships" in either state. *See* A.R.S. § 25-1031(A)(2)(b).

¶22 The third ground for exercising subject matter jurisdiction applies when a state with jurisdiction declines to exercise that jurisdiction because another state is a more appropriate forum. *See* § 25-1031(A)(3) ("All courts having jurisdiction under paragraph 1 or 2 have declined to exercise

jurisdiction on the ground that a court of this state is the more appropriate forum . . . ."). That provision does not apply here because neither Arizona nor Indiana has jurisdiction under § 25-1031(A)(1) or (2).

¶23 It is the fourth ground for jurisdiction, § 25-1031(A)(4), that allows Arizona to exercise jurisdiction over these proceedings. Under that provision, a state may exercise jurisdiction when no other state has jurisdiction under any of the first three grounds. Because Indiana lacks such jurisdiction, Arizona has jurisdiction under § 25-1031(A)(4) consistent with its state constitutional and statutory authority. *See* Ariz. Const. art. VI, § 15 ("The jurisdiction and authority of the courts of this state in all proceedings and matters affecting juveniles shall be as provided by the legislature . . . ."). "The juvenile court [has] exclusive original jurisdiction over petitions to terminate the parent-child relationship when the child involved *is present in the state*." A.R.S. § 8-532(A) (emphasis added); *see also* A.R.S. § 8-201(21) ("'Juvenile court' means the juvenile division of the superior court when exercising its jurisdiction over children in any proceeding relating to delinquency, dependency or incorrigibility."). T.D. was present in Arizona when DCS filed its petitions for dependency and termination; accordingly, under § 25-1031(A)(4) Arizona's juvenile court had subject matter jurisdiction to consider both petitions and all related proceedings involving T.D.'s care and custody.

¶24 A key purpose of the UCCJEA is to avoid jurisdictional conflicts by creating "consistency in interstate child custody jurisdiction and enforcement proceedings." *Angel B.*, 234 Ariz. at 72, ¶ 7 (citation and quotation omitted); *see also Welch-Doden v. Roberts*, 202 Ariz. 201, 206, ¶ 24 (App. 2002). Our analysis reflects this purpose because there has never been any kind of case relating to T.D., much less a custody determination, filed in or order issued by an Indiana court. And other than participating in the brief hearings conducted by the juvenile court to resolve subject matter jurisdiction, neither Indiana's courts nor Indiana DCS have any connection to this child. The parents cite no authority suggesting a court that makes an initial custody determination under its state constitutional and statutory authority may lose jurisdiction under the UCCJEA without any actual jurisdictional conflict with another state. *Cf. Holly C.*, 247 Ariz. at 507, ¶ 34 (noting "§ 8-202 is of little help in determining jurisdiction when there is a *competing jurisdictional claim* of another state" (emphasis added)).

¶25 Because the juvenile court was authorized under Arizona law to make an initial custody determination under § 25-1031(A)(4) and § 8-532 when DCS filed its petitions, and made subsequent custody determinations throughout the proceedings, the juvenile court has continuously retained

subject matter jurisdiction over these matters. *See Angel B.*, 234 Ariz. at 72, ¶ 11 (citing A.R.S. § 25-1032(A)) ("Once a court with original jurisdiction issues an initial child custody order, the UCCJEA gives that court exclusive, continuing jurisdiction over all future custody determinations, subject to statutory exceptions."); *Melgar v. Campo*, 215 Ariz. 605, 607, ¶ 11 (App. 2007) (recognizing that "[t]he rule of exclusive, continuing jurisdiction remains the jurisdictional lodestar until either the court that originated the order determines that the child's connection with the state is too attenuated or that the child *and* parents no longer reside in the state").

### B.     Telephonic Hearing

**¶26**      Mother argues the juvenile court violated her constitutional rights and abused its discretion when it conducted the dependency and termination hearing by phone. Acknowledging the importance of the interests at stake, we conclude the court's decision to hold a telephonic hearing did not violate Mother's due process rights and was within the court's discretion.

#### 1.     Due Process

**¶27**      In the weeks before the consolidated hearing, the COVID-19 pandemic prompted our supreme court to issue various administrative orders requiring courts to limit in-person proceedings and to use other means to take testimony. On April 14, 2020, Mother moved to continue the dependency/termination hearing until it could be safely conducted in person. She contended a telephonic hearing would violate her due process rights to assist her counsel and would create a risk of erroneous credibility determinations.

**¶28**      DCS opposed the motion and urged the court to determine whether, after balancing Mother's liberty interests against the state's interests, "the inherent value of in-person testimony is outweighed in these circumstances by the risk to trial participants' health, given the present threat of an easily transmitted and potentially fatal virus in the community." DCS argued the hearing could be "conducted remotely without unduly sacrificing due process protections," explaining that exhibits could be distributed electronically to all parties, and that if communication issues arose the court would retain the option of continuing a portion of the hearing to address specific issues.

**¶29**      The juvenile court denied Mother's motion, citing an administrative order issued by our supreme court, which directed the juvenile court to use remote technologies in lieu of in-person hearings due

to the public health crisis. *See* Ariz. Sup. Ct. Admin. Order No. 2020-47 (Mar. 16, 2020); *see also* Ariz. Sup. Ct. Admin. Order No. 2020-60 (Apr. 6, 2020); Ariz. Sup. Ct. Admin. Order No. 2020-70 (Apr. 16, 2020). Noting the hearing had already been delayed for several months, the court further reasoned that

> [w]hile procedural due process may typically require in-person termination or dependency adjudications, the right to in-person proceedings may be limited where it is justified by necessity. At this current time, Arizona is in the midst of the COVID-19 pandemic. In person proceedings place the health and safety of all participants at risk. Moreover, there is no immediate indication of when it will be safe to return to fully in-person proceedings, with all participants present in court. Given the ongoing pandemic, and the reality of there not being an obvious end in sight, this Court concludes that Mother's procedural due process rights will not be violated by proceeding with a telephonic termination/dependency trial.

¶30        At the outset of the April 24 hearing, Mother's counsel renewed her objection to participating telephonically, and Father's counsel joined the objection. The GAL also objected, asserting that holding the hearing in this manner would create appealable issues, causing further delay. The court proceeded with the hearing over their objections.

¶31        Mother argues she was deprived of due process because her right to actively participate and aid her attorney was restricted, and her attorney was limited in her ability to effectively cross-examine witnesses and to verify and introduce exhibits. We review constitutional issues de novo. *Brenda D. v. Dep't of Child Safety*, 243 Ariz. 437, 442, ¶ 15 (2018). In a termination hearing, an indigent parent has a right to counsel by statute, A.R.S. § 8-221; by rule, Rule 38(B); and as a matter of due process, *Daniel Y. v. Ariz. Dep't. of Econ. Sec.*, 206 Ariz. 257, 260, ¶ 14 (App. 2003) (holding a parent's right in juvenile matters is "not co-extensive with a criminal defendant's right . . . under the Sixth Amendment" but still has a "constitutional dimension"). "[D]enial of the right to effective participation of counsel" in a dependency proceeding "constitutes a denial of due process of law so gross as to lack a necessary attribute of a judicial determination." *Ariz. State Dep't of Pub. Welfare v. Barlow*, 80 Ariz. 249, 253 (1956). If a parent is denied the right to counsel at a hearing, the order that results is "void." *Id*.

¶32 Unlike previous termination cases in which courts have found a denial of the right to counsel, Mother does not claim an absence of counsel. *See Bob H. v. Ariz. Dep't of Econ. Sec.*, 225 Ariz. 279, 283, ¶ 18 (App. 2010) (juvenile court reversibly erred in commencing termination hearing without mother's counsel present); *Christy A. v. Ariz. Dep't of Econ. Sec.*, 217 Ariz. 299, 307, ¶ 29 (App. 2007) (juvenile court "should have briefly continued the evidentiary hearing to allow mother's counsel the opportunity to appear and participate"). Instead, Mother asserts that although she had representation, her ability to communicate with her attorney and thereby assist in her defense was diminished. Because Mother's claims do not rise to the level of complete denial of her right to effective participation of counsel, the order from the hearing is not void. *See Brenda D.*, 243 Ariz. at 446, ¶ 30 (distinguishing complete absence of counsel from situation where counsel could still cross-examine and make objections on behalf of parent who failed to appear). However, we still must analyze whether any diminution in Mother's ability to communicate with her attorney violated Mother's due process rights.

¶33 Courts may not terminate parental rights without affording parents fundamentally fair procedures that satisfy due process. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 24 (2005). Generally, due process requires an "opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Dep't of Child Safety v. Beene*, 235 Ariz. 300, 305, ¶ 11 (App. 2014) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). Determining what process is due requires analysis of four factors: (1) the "nature of the proceedings," (2) the "private interests at stake," (3) the "interests of the state," and (4) the "risk that the procedures used will lead to erroneous decisions." *Id.*

¶34 As to the nature of the proceedings, termination hearings are to be conducted informally. *Id.* at 306, ¶ 12; Ariz. R. P. Juv. Ct. 6. In addition, these hearings generally must occur on a relatively strict timeline to ensure permanency for the child involved. *See Trisha A. v. Dep't of Child Safety*, 247 Ariz. 84, 91, ¶ 30 (2019) (emphasizing importance of "timely stability and permanency" for the child). Here, the joint hearing had been delayed several months and a continuance until after COVID-19 restrictions were lifted could have led to a longer delay. Concerning the private interests at stake, parents have "a fundamental liberty interest in the care, custody, and management of their children." *Kent K.*, 210 Ariz. at 284, ¶ 24. Children also have interests that are entitled to protection, including the right to "effective parental care." *Maricopa Cnty. Juv. Action No. JD-561*, 131 Ariz. 25, 28 (1981). Regarding the interests of the state, not only does the state have a compelling interest in protecting the welfare of children, *Beene*,

235 Ariz. at 306, ¶ 13, it also bears a significant responsibility for public health during the COVID-19 pandemic.

¶35 Finally, as to the risk that the procedures used will lead to erroneous decisions, we look to the specific circumstances of the case, including any procedural safeguards provided. *See id.* at 307, ¶¶ 17–18. As noted in the criminal context, courts generally prefer in-person testimony because it "ensures the reliability of the evidence by allowing the trier of fact to observe the demeanor, nervousness, expressions, and other body language of the witness," conveys to the witness the seriousness of the proceedings, and ensures the witness is not being coached or relying on extraneous materials. *State v. Moore*, 203 Ariz. 515, 517, ¶ 7 (App. 2002) (citation and quotation omitted). However, the circumstances of the current global pandemic are not normal, and in-person hearings during the height of the pandemic have created unique challenges. For example, such hearings may require the use of social distancing and masks, which could interfere with a fact-finder's ability to judge a witness's demeanor and facial expressions. On the other hand, even when a court hears telephonic testimony it may rely on other means to judge a witness's credibility, such as assessing the witness's tone or inflection, and identifying inconsistencies between the testimony and objective documentary evidence. *See Anderson v. City of Bessemer*, 470 U.S. 564, 574–75 (1985).

¶36 In addition, in this case the juvenile court employed some safeguards to protect Mother's rights. For example, throughout the hearing, the court periodically confirmed that the participants had not been disconnected, inquired whether a witness was impermissibly reading from a document, and accommodated technical difficulties. Indeed, as the second day of the hearing began on April 28, no one expressed any concerns to the court about continuing to conduct the hearing telephonically.

¶37 When an issue arose about the accuracy of certain exhibits, the court took steps to ensure all parties were reviewing the same evidence. Mother's counsel expressed concern that she had not received an exhibit log from DCS until shortly before the hearing and was unable to verify whether the exhibits she had received in discovery matched those being presented in court. DCS explained that Mother had received all required discovery, with the exception of two documents DCS had received only recently. The court arranged for a post-hearing period for counsel to review the exhibits admitted into evidence and confirm they were in fact the same exhibits that were previously disclosed, marked, and shown to parent's counsel. And the court advised the parties it would not take the matters

under advisement until after counsel had an opportunity to review and make new objections to the exhibits.

¶38        Moreover, although Mother contends her counsel's ability to cross-examine witnesses and handle exhibits was adversely affected, she does not explain what she or her counsel would have done differently if the hearing had been in person or how it would have made a difference in the outcome. *See In re A.H.*, 950 N.W.2d 27, 37 (Iowa Ct. App. 2020) (denying a parent's due process challenge to a telephonic hearing, in part, because the parent had not identified "any error or risk of error that occurred during the hearing as a result of the telephonic procedures other than generally 'questioning' the ability of counsel to represent" her).  Mother was represented by counsel, testified, was able to hear the presentation of evidence, and her counsel cross-examined the State's witnesses.  Mother has not identified any defects or failures in the technology the court employed, nor has she specified any instance when she wished to speak with counsel privately and was denied the opportunity to do so, or how the manner in which the hearing proceeded impaired her counsel's ability to cross-examine a witness or to offer other evidence.  Based on the court's findings, DCS proved the grounds for termination by clear and convincing evidence; Mother has not challenged any of those findings.

¶39        The juvenile court could have adopted additional safeguards that might have been helpful in conducting a telephonic hearing.  Giving the parents "frequent breaks to consult privately by telephone with counsel" might have alleviated some of the concerns Mother raises.  *See id.* Ensuring the timely exchange/disclosure of exhibits, along with anticipating how exhibits may be viewed during the hearing, would have assisted the court and parties in avoiding the exhibit issue discussed above. Additionally, a better alternative could be videoconferencing, assuming reliable technology is available without unduly burdening the participants. In any event, the juvenile court is in the best position to assess what safeguards it should implement to ensure the rights of all parties are protected when the court conducts any proceeding in which the participants cannot be present in the courtroom.

¶40        After weighing the *Eldridge* factors, we conclude Mother was afforded adequate due process in this case, as the relatively minimal risk of error inherent in receiving testimony by telephone was remedied by safeguards and outweighed by the significant risks presented by the COVID-19 pandemic.  The decision how to conduct a proceeding, especially during a pandemic, is best left to the juvenile court.  A court may evaluate various factors when making that decision, including the fundamental right

to parent, the child's best interests, the length of time a case has been pending, the parents' involvement (or lack thereof) in reunification services, the expected length of the hearing, the number of witnesses who will be testifying, whether the parties intend to object to exhibits, and the extent to which the court will be relying on testimony or instead on documentary evidence. *See JD-561*, 131 Ariz. at 27 (recognizing that resolving questions of due process in juvenile cases requires courts to "weigh and balance the competing interests" of the state, the parents, and the children). Indeed, establishing a bright-line rule requiring in-person testimony in all instances is unworkable, and in some instances might even deprive a parent of due process if special circumstances would not allow a parent to fully participate remotely, such as when a parent is incarcerated, has a serious illness, or lives in another state or country. We conclude that Mother's right to due process was not violated.

## 2. Discretionary Decision

**¶41** Mother also argues that even if her due process rights were not infringed by the manner in which the hearing proceeded, the court nonetheless abused its discretion by holding a telephonic hearing. We review a court's ruling on a discretionary matter for an abuse of discretion. *Adrian E. v. Ariz. Dep't of Econ. Sec.*, 215 Ariz. 96, 101, ¶ 15 (App. 2007). Such a ruling will be reversed only if it is "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *Id*.

**¶42** The juvenile court has discretion to "permit telephonic testimony . . . in any dependency . . . or termination of parental rights hearings" on the court's own motion or by motion of a party. Ariz. R. P. Juv. Ct. 42. In the wake of the COVID-19 pandemic, the Arizona Supreme Court extended even greater discretion to superior court judges to hold telephonic hearings. *See* Ariz. Sup. Ct. Admin. Order No. 2020-47. The court ordered that all in-person hearings must "be avoided to the greatest extent possible consistent with core constitutional rights." *Id.* To effect that ruling, judges were encouraged to "us[e] available technologies, including . . . teleconferencing." *Id.* In a related order issued by the Maricopa County Superior Court, the mandate was more specific: except for limited exceptions, "no in-person proceeding[s]" would take place during April 2020, though the court would "continue to hold telephonic hearings." Maricopa Cnty. Sup. Ct. Amended Admin. Order No. 2020-055 (Apr. 1, 2020). Thus, these orders granted even more discretion to judges to hold telephonic hearings to address public health concerns, and Mother does not argue the orders are unconstitutional or otherwise invalid.

¶43        In denying Mother's motion to continue the hearing, the juvenile court recognized that the ongoing pandemic (with no foreseeable end date) required the court to consider alternatives. We cannot say the court abused its discretion in holding a telephonic hearing.

## CONCLUSION

¶44        We affirm the juvenile court's order granting DCS's petitions for dependency and termination.

